Rosa Mercado Rivera, demandante y recurrente, *v.* Universidad Católica de Puerto Rico, demandada y recurrida; Jeannette Quilichini et al., demandantes y recurrentes, *v.* Universidad Católica de Puerto Rico, demandada y recurrida.

*Números:* RE-90-577 RE-90-578 *Resueltos:* 27 de junio de 1997

*Jesús Hernández Sánchez* y *Ramón Lloveras Otero*, abogados de las recurrentes; *José Guillermo Vivas* y *José Héctor Vivas*, de *Vivas & Vivas*, abogados de la recurrida.

EL JUEZ PRESIDENTE SEÑOR ANDRÉU GARCÍA emitió la opinión del Tribunal.

Nos corresponde en esta ocasión examinar, dentro del marco constitucional que prescribe la separación de la Iglesia y el Estado, los derechos que pudiesen cobijar a profesores que laboran en una institución de educación superior frente a la autonomía religiosa reclamada por dicha institución. Revisemos los hechos de los recursos presentados por la Profesora Jeannette Quilichini y la Profesora Rosa Mercado que, por plantear controversias similares, hemos consolidado.

## I

La recurrente Jeannette M. Quilichini y otros presentaron un recurso de revisión contra la recurrida Universidad Católica de Puerto Rico.

La señora Quilichini fue bautizada y ha pertenecido siempre a la Iglesia Católica. Contrajo nupcias con el Sr. Rafael Quiñones bajo el sacramento del matrimonio católico y conforme con los rituales de dicha iglesia. Luego de más de seis (6) años de matrimonio, los esposos Quiñones-

Quilichini se divorciaron mediante el procedimiento civil correspondiente ante el entonces Tribunal Superior de Puerto Rico, Sala de Ponce.

En 1974, la Universidad Católica de Puerto Rico (en adelante la Universidad) le extendió a la señora Quilichini un contrato para que ésta ejerciera labores docentes a tiempo parcial en dicha institución. La Universidad es una corporación sin fines de lucro instituida para la educación superior y erigida canónicamente por la Santa Sede el 15 de agosto de 1972.[1] Según se colige de los hechos, para la fecha en que se perfeccionó el contrato, la demandante ya se había divorciado del Sr. Rafael Quiñones. Las autoridades de la Universidad estaban enteradas del estado civil de la recurrente al momento en que le extendieron este contrato original.

Cada año, las partes comparecían y otorgaban un Contrato anual de facultad mediante el cual el profesor se comprometía a desempeñarse de la manera más eficiente y con sujeción a las normas vigentes en los estatutos, el catálogo, el Manual del Claustro y cualquier regla y reglamento de la Institución, así como las que se pudieran adoptar en el futuro. Específicamente, disponían dichos contratos, en lo pertinente, que:

PRIMERO:
b) Dichas funciones [tales como tutoría, orientación académica y asistencia en tareas administrativas de la Facultad a la que pertenecieren] y las concomitantes a la tarea universitaria en general, las realizará el claustral a tiempo completo, con eficiencia profesional, responsable y diligentemente, con sujeción a las disposiciones del Artículo XIII de los Estatutos de la Universidad, *a las disposiciones aplicables contenidas en el Manual del Claustro* y en las directrices y reglamentos de la Universidad, así como a otras normas que adopten durante la vigencia de este contrato las autoridades universitarias competentes.

---

[1] Este reconocimiento eclesiástico lleva consigo la aplicación *ex propio vigore* de las normas de Derecho Canónico y de los decretos de la Sagrada Congregación para la Educación Católica. Introducción, Manual del Claustro, Universidad Católica de Puerto Rico, ed. rev., julio 1982.

c) El cuadro normativo de la Universidad, mencionado en el número anterior, aplicará a este contrato según esté vigente al momento del otorgamiento de este acuerdo y como sea enmendado durante la vigencia del mismo.[2] (Énfasis suplido.) Caso Núm. RE-90-578, Parte II, pág. 380.

Debido al excelente desempeño de la profesora Quilichini como Catedrática Auxiliar, la Universidad le notificó que a partir de 1ro de agosto de 1982 le conferiría permanencia (*tenure*) como profesora de inglés en la Facultad de Artes y Humanidades.

El 3 de julio de 1986, la profesora Quilichini contrajo matrimonio civil con el Sr. Diego P. Sevillano. Al momento de contraer segundas nupcias, la señora Quilichini no había solicitado la declaración de nulidad de su primer ma-

---

[2] Este lenguaje correspondía a los contratos anuales de facultad más recientes antes de la concesión de permanencia a la profesora Quilichini. Éstos comprenden los siguientes periodos: 1ro de agosto de 1980 a 31 de julio de 1981 y 1ro de agosto de 1981 a 31 de julio de 1982. Contratos anteriores a esas fechas muestran lenguajes distintos, aunque todos incorporan las disposiciones de los estatutos, del Manual del Claustro y demás reglas y reglamentos, según vigentes y según fueran enmendadas.

El contrato utilizado para el año comprendido entre agosto de 1975 a 31 de julio de 1976 lo establecía, en lo pertinente, de la manera siguiente:

"PRIMERA: El profesor se obliga a trabajar en la Institución con eficiencia, responsabilidad y diligencia comprometiéndose a desempeñar sus funciones docentes y extracurriculares en esta Institución a tiempo completo y de la manera más eficiente, con sujeción a las disposiciones del Artículo XIII de los Estatutos, el Manual del Claustro Universitario, así como a cuantas disposiciones pudieren v[á]lidamente adoptar en el futuro las autoridades universitarias competentes y según los términos y condiciones mutuamente acordados:

"(f) El profesor se compromete a cumplir con las normas establecidas en los Estatutos, el Catálogo, el Manual del Claustro Universitario y las otras Reglas y Reglamentos de la Institución, así como las que se pudien adoptar en el futuro." Caso Núm. RE-90-578, Parte II, pág. 391.

De otra parte, los contratos para los años 1976–1977 y 1977–1978 utilizaban el lenguaje siguiente:

"PRIMERA: El profesor se obliga a trabajar en la Institución con eficiencia, responsabilidad y diligencia comprometiéndose a desempeñar sus funciones docentes y extracurriculares en esta Institución a tiempo completo y de la manera más eficiente, con sujeción a las disposiciones de los Estatutos, el Catálogo, el Manual del Claustro Universitario y otras Reglas y Reglamentos de la Institución, así como las que pudieren adoptar válidamente en el futuro las autoridades universitarias competentes." Caso Núm. RE-90-578, Parte II, pág. 393.

Los contratos para los períodos comprendidos entre 1978 a 1980 no constan en el expediente.

trimonio según dispone el Derecho Canónico y determinan los tribunales eclesiásticos.

Así las cosas, y luego de que las autoridades de la Universidad se enteraran de que la señora Quilichini había contraído nuevamente matrimonio sin que se hubiere declarado nulo su anterior enlace, el Presidente de la Universidad le cursó una misiva suspendiéndola temporeramente con derecho a sueldo, mientras se dilucidaba la alegada violación a las normas de la Universidad y, consecuentemente, su posible despido. En específico, la norma a la que se refería la Universidad era el inciso (C) del Manual del Claustro, que en su parte pertinente dispone:

*El claustral deberá observar una conducta acorde con los valores y normas éticas de la Iglesia Católica (dentro y fuera de la Universidad)* y ser leal a la Institución contribuyendo positiva y eficazmente a la consecución de sus fines y objetivos.[3] (Énfasis suplido.) Caso Núm. RE-90-578, Parte II, pág. 203.

Alega la Universidad que esta disposición responde a la principal fuente de las normas de la Iglesia que es el Código de Derecho Canónico. Especialmente, en lo que a universidades católicas respecta, el Canon 810 del Código de Derecho Canónico impone el deber de velar por que los profesores de las instituciones de educación superior guarden fidelidad a la doctrina católica y que remuevan de sus cargos a aquellos que no cumplan con ésta. En dicho código también se establece que el matrimonio es una alianza sacramental indisoluble. Por lo tanto, quien mantiene un

---

[3] Este inciso fue enmendado y notificado a los miembros del claustro el 4 de abril de 1983 mediante carta de la Sra. Nylda Hatton, entonces Vicepresidenta Asociada de Asuntos Académicos. En dicha misiva se expresaba que: "con el fin de que nuestra Universidad esté a tono con las exigencias de la Constitución Apostólica 'Sapientia Christiana'" se aprobó el cambio. Sin embargo, el cambio iba dirigido a enmendar la última oración, pues ya en el manual de 1982 se establecía el deber de conducirse acorde con los valores y las normas de la Iglesia Católica. Dicho texto anterior, vigente desde julio de 1982, disponía:

"El claustral deberá observar una conducta acorde con los valores y normas éticas de la Iglesia Católica (dentro y fuera de la Universidad) y ser leal a la Institución. Esta lealtad supone entre otras cosas preservar el buen nombre de la Universidad Católica." Caso Núm. RE-90-578, Parte II, pág. 224.

vínculo matrimonial no declarado nulo, no puede válidamente intentar contraer matrimonio nuevamente. Cánones 1055, 1056 y 1085 del Código de Derecho Canónico.

A la profesora Quilichini se le informó sobre su derecho a solicitar una vista para dilucidar el asunto de su despido. El 15 de septiembre de 1986, y luego de solicitarlo la parte recurrente, la Universidad celebró una vista administrativa ante el Oficial Examinador, Lcdo. Nuncio Fratallone Di Gangi, quien luego de escuchar a las partes, encontró probados los hechos relacionados con el segundo matrimonio civil de la profesora Quilichini. A tenor con el informe del examinador, y según confirmado por un comité ad hoc del Senado Académico, el Presidente de la Universidad procedió a notificar a la recurrente que quedaría destituida de su cargo. La profesora recurrió de dicha determinación ante la Junta de Síndicos. Este Cuerpo confirmó la acción tomada por el Presidente de la Universidad.

## II

En lo referente al recurso de revisión de Rosa Mercado Rivera contra la Universidad Católica de Puerto Rico, los hechos pertinentes son los siguientes.

El 1ro de agosto de 1976, la demandante Rosa Mercado Rivera comenzó a realizar labores docentes para la Universidad Católica, suscribiendo cada año un contrato anual de facultad. Dicho contrato, al igual que los que mediaron entre la Universidad y la profesora Quilichini, requería observar una conducta acorde con los valores y normas éticas de la Iglesia Católica. Surge del expediente, y así lo admite la propia Universidad, que la profesora Mercado desempeñó sus labores de manera eficiente durante aproximadamente once (11) años. Sin embargo, el 24 de noviembre de 1986, la profesora fue informada que su contrato(4) no sería

---

(4) En el caso de la corecurrente profesora Mercado, su último contrato anual de facultad, que vinculaba a las partes durante el período de 1ro de agosto de 1986 a 31

renovado, siendo destituida luego de que las autoridades de la Universidad determinaran que la profesora se encontraba en una situación canónicamente irregular, por haber contraído nupcias con una persona anteriormente casada por la Iglesia Católica, cuyo primer matrimonio no había sido declarado nulo.

Por estar en desacuerdo con las actuaciones de la Universidad, la profesora Quilichini y la profesora Mercado presentaron sendas demandas en el antiguo Tribunal Superior, Sala de Ponce. Éstas solicitaron que se declarasen inconstitucionales las disposiciones del Manual del Claustro relativas a la causal de despido por conducta canónicamente irregular y los estatutos en lo referente a las cualidades del claustro(⁵) en los cuales se basó la Universidad para despedirlas. Asimismo, argumentaron que sus respectivas cesantías eran contrarias a disposiciones establecidas por el legislador en la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. sec. 146 *et seq.*), según enmendada. Además, solicitaron la concesión de ciertas sumas de dinero en concepto de daños y perjuicios.

El tribunal de instancia (Hon. Leida González Degró, Juez), mediante Sentencia de 9 de julio de 1990, sostuvo que la Universidad cumplió sustancialmente con el proce-

---

de julio de 1987, en lo pertinente, disponía:

"PRIMERO:

"b) El CLAUSTRAL realizará dichas funciones y las concomitantes a la tarea universitaria con eficiencia profesional, responsable y diligentemente, y con sujeción al Artículo XIII de los Estatutos de la Universidad y a las disposiciones aplicables contenidas en el Manual del Claustro y en las directrices y reglamentos de LA UNIVERSIDAD, según éstas estén vigentes al momento del otorgamiento de este contrato, así como cualquier otra política, norma o enmienda que durante la vigencia del mismo adopten las autoridades universitarias competentes." Caso Núm. RE-90-577, Oposición a solicitud de recurso de revisión, Apéndice, pág. 29.

(⁵) El Art. XIII, Sec. 2, de los Estatutos de la Universidad Católica de Puerto Rico, ed. rev., agosto de 1980, pág. 32, dispone que "[e]l candidato para la posición de claustral debe poseer los grados académicos apropiados, ser de segura formación católica o, si no es católico, completamente respetuoso del catolicismo, ser de buen carácter moral y dar evidencia de cualidades pedagógicas". Caso Núm. RE-90-578, Parte II, pág. 194. Además, el Art. IV(CH)(6)(a)(3) del Manual del Claustro, *supra*, pág. 20, establece como una de las causas de despido la "[c]onducta profesional o personal que viole los postulados de la doctrina y la moral de la Iglesia Católica". Caso Núm. RE-90-578, Parte II, pág. 221.

dimiento que regula lo pertinente a la presentación de quejas y separación del cargo de los profesores, según señalado en los estatutos, establecido por el Senado Universitario y publicado en el Manual del Claustro; que no existía evidencia en el expediente que estableciera que la medida disciplinaria utilizada contra ambas profesoras obedeciera a un subterfugio por parte de la Universidad para ocultar una actuación discriminatoria. Respecto a la alegación de ambas recurrentes de que su derecho a la intimidad fue vulnerado por la Universidad, el tribunal dictaminó que en virtud de los contratos suscritos y de su afiliación voluntaria a la Iglesia Católica, estaban sujetas a la disciplina de la fe acorde con la doctrina religiosa que estima indisoluble el matrimonio y, por lo tanto, impedía que ejercieran funciones académicas en dicha institución. Sin embargo, concluyó, los tribunales no pueden pasar juicio sobre estas creencias según lo proscribe la Constitución del E.L.A.

Inconformes con la determinación del tribunal de instancia, ambas acuden ante nos alegando la comisión de varios errores por parte de dicho tribunal.

A fines de la discusión, podemos agrupar las controversias de la manera siguiente: primero, si sus respectivos despidos fueron ilegales al ser motivados por razón de discrimen, lo que representa una violación a la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. sec. 146 *et seq.*). Segundo, si la Universidad cumplió con el procedimiento de despido, según dispuesto en sus reglamentos. Tercero, si incurrió en un incumplimiento del contrato al incluir los postulados de Derecho Canónico y aplicar las disposiciones del Manual del Claustro de julio de 1982 a la relación contractual entre las partes. Cuarto, si la Universidad violó el derecho a la intimidad de ambas recurrentes al basar la determinación sobre sus despidos en una actuación tan íntima como lo es la decisión de contraer matrimonio.

La American Association of University Professors solicitó permiso para intervenir como *amicus curiae,* a lo que accedimos.

## III

En el primer señalamiento de error se nos plantea que la cesantía de las profesoras por parte de la Universidad constituyó una violación de las disposiciones de la Ley Núm. 100, *supra,* la cual expresamente prohíbe el despido de un empleado por parte de su patrono por motivo de edad, raza, color, género, nacimiento, origen o condición social e ideas políticas o religiosas. Aunque el planteamiento de discrimen no es perfectamente claro, de los alegatos se desprende que las recurrentes hacen particular referencia al discrimen por razón de género.

A esos efectos, argumentan posibles interpretaciones de dicha ley en favor y en contra de su aplicabilidad a entidades religiosas. Sin embargo, no es necesario que nos adentremos en esa discusión. De los hechos creídos por el tribunal de instancia y ante nuestra consideración, surge que, independientemente de la posición que adoptemos con relación a la aplicabilidad o no de la Ley Núm. 100, *supra,* a la Universidad Católica, "[n]o hay prueba en los autos que establezca que la medida disciplinaria obedezca a un subterfugio para ocultar algún tipo de discrimen. Es la propia creencia religiosa la que impide a la demandante poder ejercer funciones académicas en esa institución". (Sentencia del Tribunal Superior de 9 de julio de 1990, pág. 12.) Caso Núm. RE-90-578, Parte I, Solicitud de revisión, Apéndice, pág. 13.

El expediente muestra que luego de que se cesanteara a las recurrentes, su representación legal, mediante un requerimiento de admisiones fechado el 3 de agosto de 1987, solicitó de la Universidad que admitiera que en la institución había un grupo de profesores que estaba bajo idéntica

situación que las recurrentes en lo referente a su estado civil, pero contra quienes no se les había presentado cargos con el fin de cesantearlos. En su contestación, la Universidad ofreció una lista de cinco (5) profesores que estaban en idéntica situación. A su vez, reveló que cuatro (4) de estos profesores, *entre los que se encontraba una mujer*, fueron notificados a los efectos de que si no tomaban acción alguna sobre su situación serían despedidos inmediatamente. Asimismo, la Universidad informó durante el juicio que no había presentado cargos contra estos profesores, pues sus casos estaban sometidos ante el Tribunal Eclesiástico para que éste determinara si procedía o no la declaración de nulidad de dichos matrimonios, y para la fecha del litigio, no habían sido resueltos. En consideración a la adjudicación final de esas controversias, la Universidad optó por suspender el despido sujeto a las determinaciones eclesiásticas. Solamente uno de los matrimonios no fue declarado nulo y el profesor renunció a su cátedra, por lo que no fue necesario recurrir al proceso de separación.

■ Tomando en conjunto estos hechos que merecieron la credibilidad del tribunal de instancia, no podemos afirmar que estamos ante un caso de discrimen por razón de género como alegan las recurrentes. Según surge del expediente, la Universidad, al percatarse de la situación particular de los claustrales, tomó medidas similares independientemente del género de los profesores en cuestión. No hay indicio alguno de que el proceso disciplinario se llevara a cabo de forma discriminatoria contra las recurrentes. Es norma reiterada de este Tribunal el no intervenir en la apreciación que de la prueba desfilada haya hecho el foro de instancia en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Monllor v. Soc. de Gananciales*, 138 D.P.R. 600 (1995); *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172 (1985); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721 (1984). Las recurrentes no presentaron fundamentos válidos para demostrar que existían cualquiera

de las anteriores circunstancias que ameritara nuestra intervención.

## IV

El segundo señalamiento de error plantea que la Universidad Católica, en el caso de la profesora Quilichini, no cumplió con el procedimiento que se había comprometido a seguir. No le asiste la razón.

El Art. XIII, Sec. 9 de los Estatutos de la Universidad Católica de Puerto Rico, ed. rev., agosto de 1980, dispone que cuando la Universidad esté obligada a separar de su cargo o suspender a un claustral, seguirá el procedimiento establecido por el Senado Académico y publicado en el Manual del Claustro. En este último se establece detalladamente dicho procedimiento en su Art. IV(CH)(6)(c), el cual resumimos a continuación.

La presentación de quejas puede recibirla el Vicepresidente de Asuntos Académicos, por escrito, de cualquier persona vinculada o no con la Universidad que tenga personal conocimiento de conducta constitutiva de causa de despido o, también por escrito, de un miembro de la administración o superior del claustral que conozca hechos constitutivos de causal de despido por información suministrada. El Vicepresidente de Asuntos Académicos determinará si hay causa probable para formular cargos. De haberla, entrevistará al claustral para notificarle la queja presentada y darle la oportunidad de refutarla. El Vicepresidente podrá continuar el procedimiento y formular cargos contra el claustral ante el Presidente de la Universidad, quien, a su vez, notificará al claustral dándole la oportunidad de contestar por escrito los cargos. También el Presidente informará al claustral de su derecho a que se celebre una audiencia ante un Oficial Examinador. El claustral deberá contestar los cargos por escrito y notificar al Presidente si desea que se celebre la audiencia.

En la audiencia el Vicepresidente de Asuntos Académicos o su delegado podrá presentar prueba oral o escrita. El claustral o su abogado podrán contrainterrogar a los testigos en su contra, ofrecer prueba a su favor y refutar la prueba presentada en su contra. El Oficial examinará la prueba y determinará si el claustral ha incurrido en causa de suspensión o destitución.

El Oficial enviará por escrito al Presidente y al claustral sus determinaciones y conclusiones. El Presidente enviará dichas determinaciones y conclusiones a un comité ad hoc elegido por el Senado Académico compuesto por tres (3) de sus miembros electos no directamente relacionados con el caso. Este Comité confirmará o no las determinaciones del Oficial Examinador y si decide que el claustral incurrió en los cargos imputados impondrá las sanciones que considere más justas. De esta decisión informará al Presidente de la Universidad y al claustral.

De ser adversa al claustral la decisión del Comité, ésta será sometida al Presidente para su aprobación. En los casos de claustrales con permanencia, de la decisión del Presidente podrá solicitarse revisión ante la Junta de Síndicos. La Junta tendrá discreción para conceder o denegar la revisión. Con la decisión de la Junta concluye el procedimiento, pues esta determinación será final.

Conforme surge del expediente y de la sentencia del tribunal a quo, la Universidad cumplió sustancialmente con este procedimiento. Así, cuando la Vicepresidenta de Asuntos Académicos, Dra. Lillian Ramos, advino en conocimiento del matrimonio de la profesora Quilichini con el Sr. Diego Sevillano mediante una comunicación anónima, refirió ésta al Decano del Colegio de Artes y Humanidades, Rev. P. Félix Lázaro, quien entrevistó a la profesora acerca de la información recibida. La profesora le informó de la veracidad de estos hechos y de que su anterior matrimonio no se había declarado nulo por un tribunal eclesiástico. El Decano informó por escrito a la Vicepresidenta de Asuntos Académicos sobre el resultado de la entrevista. Esta úl-

tima citó a la profesora para entrevistarla y le inquirió sobre si había contraído matrimonio civil. La recurrente nuevamente admitió el hecho como cierto. Ante esta situación, la doctora Ramos procedió a formular cargos ante el Presidente Rev. P. Tosello Giangiacomo.

Mediante una carta de 13 de agosto de 1986, el Presidente de la Universidad notificó a la profesora Quilichini su suspensión con paga. La demandante contestó los cargos y solicitó la celebración de una vista. El 15 de septiembre de 1986, la profesora Quilichini compareció a la audiencia acompañada de abogado. El 27 de octubre de 1986, el Oficial Examinador rindió el informe en el que manifestó haber encontrado probados los cargos a la luz de la evidencia presentada.

Esa determinación fue revisada por el Comité Ad Hoc designado por el Senado Académico, que igualmente recomendó la destitución de la profesora Quilichini. Dicha recomendación fue acogida por el Presidente Rev. P. Tosello Giangiacomo quien notificó a la demandante que efectivo el 31 de octubre de ese año quedaría destituida. Finalmente, la profesora acudió a la Junta de Síndicos donde quedó finalmente confirmada la decisión del Presidente de la Universidad.

De lo anterior se desprende que la Universidad siguió el procedimiento establecido en el Manual del Claustro en lo referente a la presentación de quejas y demás procedimientos. Específicamente, se cumplió con el requisito de que la queja que presenta el supervisor de un claustral al Vicepresidente de Asuntos Académicos sea por escrito. El Manual no requiere que dicha información haya sido presentada por escrito al supervisor aunque éste sí tiene que cumplir con este requisito al presentar la queja al Vicepresidente de Asuntos Académicos. Así lo hizo el Decano Rev. P. Félix Lázaro una vez entrevistó a la recurrente profesora Quilichini y ésta admitió los hechos.

El resto del procedimiento se siguió conforme lo establece el Manual del Claustro, *supra*, págs. 20–23. No pro-

cede por lo tanto que revoquemos la determinación del tribunal de instancia concluyendo que se siguió el debido proceso que la Universidad Católica se ha comprometido a seguir en casos de destitución o suspensión de profesores.

## V

En su tercer señalamiento de error se alega que la Universidad incumplió el contrato de trabajo que tenía con las profesoras Quilichini y Mercado, razón por la cual nos piden que ordenemos su inmediata reinstalación. No les asiste la razón.

En primer lugar, debe quedar claro que aunque una de las partes en el litigio de autos es una institución educativa que reclama la no intervención de los tribunales por estar involucradas reclamaciones que podrían conducir a dilucidar asuntos de índole religiosa, podemos y debemos distinguir los distintos planteamientos ante nuestra consideración. Específicamente, en esta parte de la discusión, *solamente examinamos el planteamiento de incumplimiento contractual.* En ese sentido, no existe duda en cuanto a la autoridad que tiene un tribunal civil para intervenir en la interpretación de un contrato "libremente negociado y acordado" entre dos (2) entes privados. *Díaz v. Colegio Nuestra Sra. del Pilar*, 123 D.P.R. 765 (1989). La intervención del tribunal intenta hacer cumplir la voluntad de las partes y vindicar sus intereses contractuales. En *Díaz v. Colegio Nuestra Sra. del Pilar*, supra, aclaramos que la participación del Estado a través de los tribunales en disputas contractuales no es penetrante e incisiva en la operación de una institución educativa católica al punto de constituir una carga sustancial al libre ejercicio del culto ni promover el establecimiento de cualquier religión, según proscriben la Primera Enmienda de la Constitución de Estados Unidos y el Art. II, Sec. 3 de la Constitución del Es-

tado Libre Asociado, L.P.R.A., Tomo 1. Por lo tanto, siempre que la dilucidación de la disputa contractual no requiera pasar juicio sobre materias de doctrina, de fe o de organización eclesiástica interna, los tribunales civiles podrán ejercer jurisdicción. *Díaz v. Colegio Nuestra Sra. del Pilar*, supra, pág. 783. Véanse, además: *Agostini Pascual v. Iglesia Católica*, 109 D.P.R. 172 (1979); *Jones v. Wolf*, 443 U.S. 595, 602 (1979); *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710 (1976); *Presbyterian Church v. Hull Church*, 393 U.S. 440, 449 (1969). Con el beneficio de dicho precedente, examinemos los contratos suscritos por las partes litigantes a la luz de las disposiciones civiles aplicables a obligaciones y contratos.

■ Nuestro derecho reconoce el principio de autonomía contractual de las partes, quienes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente siempre que no sean contrarios a las leyes, la moral y el orden público. Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372. Estas obligaciones nacientes de los contratos tienen fuerza de ley entre los contratantes y deben cumplirse al tenor de éstos. Art. 1044 del Código Civil, 31 L.P.R.A. sec. 2994. Además, estando los tribunales facultados para velar por su cumplimiento, éstos no deben relevar a una parte del cumplimiento de su obligación contractual cuando dicho contrato sea legal y válido y no contenga vicio alguno. *Cervecería Corona v. Commonwealth Ins. Co.*, 115 D.P.R. 345 (1984); *Olazábal v. U.S. Fidelity, Etc.*, 103 D.P.R. 448 (1975).

Según los hechos anteriormente relatados, la profesora Quilichini fue empleada por la Universidad Católica por primera vez en 1974. En el contrato se incorporaban válidamente las disposiciones de sus estatutos y reglamentos, entre ellos el Manual del Claustro. Disponía ese primer contrato, que comprendía el período entre el primero (1ro) de agosto de 1975 al treinta y uno (31) de julio de 1976 —en lo pertinente— lo siguiente:

PRIMERA: El profesor se obliga a trabajar en la Institución con eficiencia, responsabilidad y diligencia comprometiéndose a desempeñar sus funciones docentes y extracurriculares en esta Institución a tiempo completo y de la manera más eficiente, con sujeción a las disposiciones del Artículo XIII de los Estatutos, el Manual del Claustro Universitario, así como a cuantas disposiciones pudieren válidamente adoptar en el futuro las autoridades universitarias competentes y según los términos y condiciones mutuamente acordados:

(f) El profesor se compromete a cumplir con las normas establecidas en los Estatutos, el Catálogo, el Manual del Claustro Universitario y las otras Reglas y Reglamentos de la Institución, así como las que se pudieren adoptar en el futuro. Caso Núm. RE-90-578, Parte II, pág. 391.

En ese momento el Manual de Claustro señalaba lo siguiente:

*La vida privada del profesor, por otra parte, pertenece al ámbito de su sagrada privacidad y la Universidad Católica no interfiere para nada en ello ....* Si un profesor se encuentra involucrado, en cambio, en un escándalo público que pueda afectar el prestigio de la institución universitaria ésta se reserva el derecho de estudiar la conveniencia de la continuación del contrato. (Énfasis suplido.) Caso Núm. RE-90-578, Parte II, pág. 258. Manual del Claustro Universitario, Universidad Católica de Paerto Rico, 1972–1973, pág. 258.

Sin embargo, la Universidad posteriormente enmendó el Manual del Claustro. Ya en la edición revisada de julio de 1982, la norma que regiría más directamente a los profesores y sus deberes como tales, quedaría definida en la disposición que establecía que:

El claustral deberá observar una *conducta acorde con los valores y normas éticas de la Iglesia Católica (dentro y fuera de la Universidad)* y ser leal a la Institución. Esta lealtad supone entre otras cosas preservar el buen nombre de la Universidad Católica.[6] (Énfasis suplido.) Caso Núm. RE-90-578, Parte II, pág. 224. Manual del Claustro, *supra*, pág. 25.

---

[6] Éste fue enmendado en abril de 1983. Véase escolio 3 de esta opinión.

Efectivamente, cada año las partes suscribían contratos distintos, por lo que las disposiciones del Manual que establecían que la vida del claustral se reservaba al "ámbito de su sagrada privacidad" fue aplicable a los contratos correspondientes a los años en que se mantuvo vigente el Manual de 1972–1973. Claramente, al momento de los hechos en que se fundamentó la Universidad Católica para el despido de ambas profesoras, el manual vigente era el de julio de 1982.

En el caso de la profesora Quilichini, ésta aceptó una nueva relación con la Universidad que comenzó el 1ro de agosto de 1982, fecha de vigencia de su permanencia. Es decir, *posterior a la edición de julio de 1982 del Manual del Claustro.* En los casos de claustrales([7]) permanentes, éstos no necesitan contrato anual para quedar vinculados a la Universidad. Manual del Claustro, *supra,* pág. 10. Quedan *directamente* obligados por los Estatutos, el Manual y demás reglamentos universitarios. En el Manual se define *permanencia* como "el derecho que tiene el claustral con rango académico [Instructor, Catedrático Auxiliar, Catedrático Asociado, Catedrático] a conservar su posición académica mientras desempeñe sus deberes y obligaciones con honradez y eficiencia profesional *sujeto al cumplimiento de las normas y reglamentos de la Universidad Católica de Puerto Rico*". (Énfasis suplido.) Manual del Claustro, *supra,* pág. 18. Además, el Art. XIII, Sec. 7, de los Estatutos de la Universidad Católica de Puerto Rico, *supra,* pág. 32, dispone:

> Sección 7 Los derechos, prerrogativas y deberes de los claustrales, incluido el deber fundamental de respetar el carácter católico de la Universidad, serán establecidos en los manuales o reglamentos que publiquen los organismos universitarios autorizados.

---

([7]) El término "claustral" o "miembro del claustro" está usado para describir a: catedráticos, catedráticos asociados, catedráticos auxiliares, instructores y a todos aquellos que están relacionados en la enseñanza de los estudiantes de la Universidad. Art. XIII, Sec. 1, de los Estatutos de la Universidad Católica de Puerto Rico, *supra.*

Acorde con lo anterior, el Art. IV, Sec. CH(1) del Manual del Claustro, *supra*, establece que la retención de la permanencia estará sujeta a que el claustral cumpla con las normas y los reglamentos de la Universidad, y en su Sec. CH(6)(a) se enumeran las causas para la suspensión o destitución.([8])

En el caso de la profesora Mercado, al momento de notificársele que no se le renovaría el contrato (24 de noviembre de 1986), el acuerdo vigente entre las partes era el que comprendía el período de 1ro de agosto de 1986 al 31 de julio de 1987. Éste contenía la aplicabilidad de las normas del manual, edición de julio de 1982, sobre la conducta de los profesores y bajo dichas condiciones se perfeccionó el contrato de empleo. El Art. IV, Sec. CH(6)(a)(3) del Manual del Claustro, *supra*, relativa a la destitución de claustrales, específicamente disponía como causas para la suspensión o destitución de un profesor:

> Conducta profesional o *personal que viole los postulados de la doctrina y la moral de la Iglesia Católica* o las leyes estatuidas por las autoridades civiles .... (Énfasis suplido.) Caso Núm. RE-90-578, Parte II, pág. 221 [al dorso]. Manual del Claustro, *supra*, pág. 20.

La inclusión de todas las anteriores disposiciones que hacen referencia a "los valores y normas éticas de la Iglesia" (Caso Núm. RE-90-578, Parte II, pág. 224) y a los "postulados de la doctrina y la moral de la Iglesia Católica"

---

([8]) "1) Incompetencia en el desempeño de sus funciones.

"2) Negligencia en el desempeño de sus obligaciones o falta de interés en cumplir con las obligaciones de su cargo de acuerdo con la política y procedimientos establecidos por la Universidad.

"3) Conducta profesional o personal que viole los postulados de la doctrina y la moral de la Iglesia Católica o las leyes estatuidas por las autoridades civiles, así como conducta antisocial, o perjudicial al orden, tranquilidad o disciplina de la comunidad universitaria.

"4) Atacar en la cátedra o fuera de ella las doctrinas, postulados y normas de la Iglesia Católica.

"5) Incapacidad física o mental que impida el desempeño eficiente de las labores académicas.

"6) Violación de cualquier reglamento o norma de la Universidad." Caso Núm. RE-90-578, Parte II, pág. 221 [al dorso].

'(Caso Núm. RE-90-578, Parte II, pág. 221 [al dorso]) corresponden al mandato del Canon 810,(⁹) Sec. 1 del Código de Derecho Canónico y acogen las sanciones que allí se establecen para casos de incumplimiento con estos principios y postulados. Específicamente dispone este canon:

> La autoridad competente según los estatutos debe procurar que, en las universidades católicas, se nombren profesores que destaquen, *no sólo por su idoneidad científica y pedagógica, sino también por la rectitud de su doctrina e integridad de vida; y que, cuando falten tales requisitos, sean removidos de su cargo,* observando el procedimiento previsto en los estatutos.

La profesora Mercado, *voluntaria y libremente,* aceptó las anteriores condiciones al suscribir su contrato de empleo con la Universidad Católica. Igualmente lo hizo la profesora Quilichini al aceptar su puesto como claustral permanente, pues directamente le obligaban las disposiciones reglamentarias anteriores.

Acorde con estas relaciones contractuales entre las partes y ante la situación de ambas profesoras de encontrarse en vínculos matrimoniales que contravenían "los postulados de la doctrina y la moral de la Iglesia Católica" (Caso

---

(⁹) Cabe señalar que el Canon 810 del Código de Derecho Canónico está comprendido dentro del Título III ("De la educación católica"), Capítulo II ("De las universidades católicas y otros institutos católicos de estudios superiores"). Caso Núm. RE-90-578, Parte II, pág. 147. Este capítulo se dedica a las universidades católicas que "se dedica[n] principalmente a los estudios profanos, si bien establece el c. 811 que debe haber en ellas al menos un instituto o cátedra de teología. Los destinatarios de esa enseñanza no son primordialmente los clérigos, y los grados académicos que confieren están pensados en función de la eficacia civil". Íd. Código de Derecho Canónico, Pamplona, Eds. Universidad de Navarra, 1983, pág. 501.

Las disposiciones allí incluidas sobre los requisitos de competencia científica y fidelidad a la doctrina católica por parte de los profesores, no distinguen o limitan su aplicabilidad según la materia de enseñanza a que dediquen su cátedra dentro de las universidades católicas. La única salvedad va dirigida a los profesores que expliquen disciplinas teológicas quienes deberán tener mandato de la autoridad eclesiástica competente para poder ejercer dicha función. Canon 812 del Código de Derecho Canónico.

Este capítulo, además, es distinto del Capítulo III ("De las universidades y facultades eclesiásticas") que va dirigido a regir aquellas universidades dedicadas específicamente al estudio de las disciplinas eclesiásticas y las materias con ellas relacionadas. A estas universidades les aplica la disposición del Canon 810, pero además otros requisitos más estrictos y específicos. Véase Arts. 807–821 del Código de Derecho Canónico.

Núm. RE-90-578, Parte II, pág. 221 [al dorso]), por ser contrarios a los Cánones 1055, 1056 y 1085 del Código de Derecho Canónico,([10]) la Universidad Católica correctamente concluyó que las recurrentes habían incumplido el contrato entre ellos suscrito. Es decir, fueron las profesoras quienes violaron las condiciones para permanecer en su empleo en la Universidad Católica y no a la inversa. Del lenguaje del contrato de la profesora Mercado, y de los Estatutos de la Universidad Católica y el Manual del Claustro para el caso de la profesora Quilichini, se desprendían las obligaciones y los acuerdos claramente pactados entre las partes.

## VI

■ La anterior determinación, sin embargo, nos conduce al cuarto y último señalamiento de error en que las recurrentes argumentan que el contrato mismo, a través de las disposiciones del Manual del Claustro y los Estatutos de la Universidad Católica que a su vez acogen las limitaciones canónicas, específicamente su derecho a contraer matrimonio, es inconstitucional por violar el derecho a la intimidad. La Universidad Católica, por su parte, impugna la jurisdicción de los tribunales para decidir este

---

([10]) El Canon 1055 dispone:

"... La alianza matrimonial, por la que el varón y la mujer constituyen entre sí un consorcio de toda la vida, ordenado por su misma índole natural al bien de los cónyuges y a la generación y educación de la prole, fue elevada por Cristo Señor a la dignidad de sacramento entre bautizados. Por tanto, entre bautizados, no puede haber contrato matrimonial válido que no sea por ese mismo sacramento." Caso Núm. RE-90-578, Parte II, pág. 150.

El Canon 1056 dispone:

"Las propiedades esenciales del matrimonio son la unidad y la indisolubilidad, que en el matrimonio cristiano alcanzan una particular firmeza por razón del sacramento." Caso Núm. RE-90-578, Parte II, pág. 151.

El Canon 1085 dispone:

"... Atenta inválidamente matrimonio quien está ligado por el vínculo de un matrimonio anterior, aunque no haya sido consumado.

"Sec. 2. Aun cuando el matrimonio anterior sea nulo o haya sido disuelto por cualquier causa, no por eso es lícito contraer otro, antes de que conste legítimamente y con certeza la nulidad o disolución del precedente." Caso Núm. RE-90-578, Parte II, pág. 158.

tipo de controversia por constituir una actuación contraria a las cláusulas sobre la religión del Art. II, Sec. 3 de la Constitución del E.L.A., *supra*, y de la Primera Enmienda de la Constitución de Estados Unidos. En estas circunstancias tenemos que ser particularmente cuidadosos, pues existe el peligro de impropiedad judicial, si nos adentráramos en materias de fe al juzgar asuntos contractuales. Esto quedó plasmado por la pluma del Juez Brennan al recordarnos que:

> ... First Amendment values are plainly jeopardized when church property litigation is made *to turn on the resolution by civil courts of controversies over religious doctrine and practice.* If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, *the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely eclesiastical concern.* (Énfasis suplido.) *Presbiterian Church v. Hull Church,* supra, pág. 449.([11])

Por lo tanto, es este cuarto planteamiento el que nos impone la difícil tarea de deslindar los límites de las actuaciones del Estado, en este caso a través de los tribunales, en asuntos que podrían soslayar la autonomía de instituciones religiosas a la luz de las referidas cláusulas. Veamos.

El Art. II, Sec. 3 de la Constitución del Estado Libre Asociado, *supra*, pág. 262, dispone:

> No se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio del culto religioso. Habrá completa separación de la iglesia y el estado.

El citado precepto, en su primera oración, se amolda a las llamadas cláusulas religiosas de la Primera

---

([11]) Aunque los derechos emanantes de un contrato no constituyen necesariamente derechos reales o de propiedad, según los conocemos en nuestro Derecho, se consideran como tales para fines de la aplicación de esta norma. *Díaz v. Colegio Nuestra Sra. del Pilar*, 123 D.P.R. 765, 783 (1989).

Enmienda de la Constitución de Estados Unidos.([12]) Dicho artículo consagra la libertad de culto y prohíbe que el Estado establezca una religión oficial. *Asoc. Academias y Col. Cristianos v. E.L.A.*, 135 D.P.R. 150 (1994). Además, al referirse a la "completa separación" recoge la teoría de Madison de que la relación ideal entre la Iglesia y el Estado exige el reconocimiento de dos (2) esferas de acción separadas. Véanse, en general: *Agostini Pascual v. Iglesia Católica*, supra; *Díaz v. Colegio Nuestra Sra. del Pilar*, supra; L.H. Tribe, *American Constitutional Law*, Nueva York, Ed. Foundation Press, 1988, pág. 819. La razón fundamental de Madison para favorecer la creación de dos (2) "jurisdicciones" distintas y separadas entre la Iglesia y el Estado respondía a su preocupación de que las respectivas autoridades de cada una interfirieran en las esferas de influencia y actuación de la otra; y que pudiesen causar un quebrantamiento del sistema político que comprometiera la libertad de conciencia tanto de los creyentes como de los no creyentes y así destruyera tanto al Gobierno como a la religión. Tribe, *op. cit.*, pág. 1226. Véase además, en general, P.B. Kurland y R. Lerner, *The Founders' Constitution*, Chicago, Ed. The University of Chicago Press, 1987, Vol. 5, págs. 103–110. Estas garantías de la Primera Enmienda frente al gobierno federal fueron interpretadas como aplicables frente a los estados en *Cantwell v. Connecticut*, 310 U.S. 296 (1940), y en *Everson v. Board of Education*, 330 U.S. 1 (1947).

■ Las dos (2) prohibiciones comprendidas en la primera oración de la Sec. 3 del Art. II de nuestra Constitución, *supra*, constituyen una traducción literal de las primeras dos (2) prohibiciones contenidas en la Primera

---

([12]) El texto completo de la Primera Enmienda de la Constitución de Estados Unidos dispone:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

Enmienda de la Constitución federal. Ambas prohibiciones en una y otra Constitución han sido denominadas separada y respectivamente "Cláusula de Establecimiento" y "Cláusula de Libre Ejercicio o Libertad de Culto". Aunque compatibles, en ocasiones éstas pueden confligir, por lo que existe una tensión armoniosa entre ellas causando que su jurisprudencia interpretativa se haya distinguido por buscar un balance y por procurar evitar que una se interponga a la otra. *Abington School Dist. v. Schempp*, 374 U.S. 203 (1963); Tribe, *op. cit.*, pág. 1157. En ese sentido, el desarrollo de la doctrina sobre una cláusula es relevante para la interpretación de la otra. Examinemos en términos generales el impacto e interacción entre ambas cláusulas.

La *Cláusula del Establecimiento de la Religión* representa el obstáculo constitucional por el cual está vedado al Estado patrocinar religión alguna, bien sea directamente, como una declaración oficial que señale a determinada religión como la religión del Estado, o a través de medios indirectos, como alguna ayuda económica o de otra naturaleza. 4 *Treatise on Constitutional Law: Substance and Procedure* (1992); Tribe, *op. cit.* pág. 1154. El común denominador de los casos resueltos por el Tribunal Supremo federal al amparo de la cláusula de establecimiento es la ayuda o el respaldo que directa o indirectamente han recibido, a través del tiempo, algunas Iglesias y/o escuelas parroquiales mediante programas del Estado: exenciones contributivas, subsidios, reembolso de gastos relacionados con alguna religión u organización religiosa reconocida, entre otros. Véanse: *Sloan v. Lemon*, 413 U.S. 825 (1973); *Lemon v. Kurtzman*, 403 U.S. 602 (1971); *Walz v. Tax Commission*, 397 U.S. 664 (1970); *Board of Education v. Allen*, 392 U.S. 236 (1968); *Everson v. Board of Education*, supra.([13]) En síntesis, es una prohibición amplia en contra

---

([13]) Se han impugnado programas a través de los cuales el Estado les reembolsaba los costos de transportación a los padres que enviaban a sus hijos a escuelas privadas y públicas entre las que se encontraba al menos una escuela parroquial,

de la ayuda o el auspicio estatal a religión alguna, a todas las religiones o la preferencia de una religión sobre otra. *Everson v. Board,* supra.

▆▆▆▆ Por otro lado, la garantía de la *Cláusula de Libre Ejercicio o de Libertad de Culto* consiste en prohibir de forma absoluta el que un Gobierno impida las creencias religiosas. Ésta garantiza la práctica de estas creencias, sean individuales o colectivas. *Asoc. Academias y Col. Cristianos v. E.L.A.,* supra. El hilo distintivo que une los casos resueltos al amparo de la cláusula que garantiza la libertad de culto es la presencia de algún tipo de intervención gubernamental, a través de cualquiera de sus Ramas, que dificulte o imposibilite la práctica de alguna actividad religiosa en particular. Claro está, la libertad de actuar, al amparo de una práctica religiosa, está forzosamente limitada o restringida para proteger la paz, la moral y el orden público, ya que de otra manera se instituiría un cantón aparte donde le estaría vedado al Gobierno hacer respetar las leyes de protección social. *Sucn. de Victoria v. Iglesia Pentecostal,* 102 D.P.R. 20, 22 (1974). Véanse, además: *Braunfeld v. Brown,* 366 U.S. 599 (1961); *Cantwell v. Connecticut,* 310 U.S. 296 (1940); *Reynolds v. United States,* 98 U.S. 145 (1878).([14])

▆▆▆▆ Sin embargo, si en la promoción de un fin legítimo el Estado afecta adversamente la práctica de una re-

---

*Everson v. Board of Education,* 330 U.S. 1 (1947); programas mediante los cuales el Estado proveía libros de texto a todo tipo de escuelas, incluso las parroquiales, *Board of Education v. Allen,* 392 U.S. 236 (1968); estatutos que ofrecían exenciones contributivas a una gran variedad de instituciones sin fines de lucro entre las cuales se encontraban varias iglesias, *Walz v. Tax Commission,* 397 U.S. 664 (1970); subsidios a escuelas parroquiales mediante el pago suplementario a profesores que ofrecían cursos en éstas, *Lemon v. Kurtzman,* 403 U.S. 602 (1971), y reembolsos en concepto de matrícula a los padres que enviaban a sus hijos a escuelas privadas, entre las que se encontraban escuelas parroquiales, *Sloan v. Lemon,* 413 U.S. 825 (1973).

([14]) Así, pues, se ha invocado dicha cláusula infructuosamente para impugnar leyes federales que prohibían la poligamia a pesar de que dicha práctica era requerida por la religión de los mormones, *Reynolds v. United States,* 98 U.S. 145 (1878); igualmente se validaron las leyes de cierre de los domingos a pesar de que los judíos ortodoxos alegaban que su credo les requería observar un día distinto como el de Sabbath, *Braunfeld v. Brown,* 366 U.S. 599 (1961).

ligión, la garantía constitucional requiere, en algunas situaciones, que se hagan concesiones para permitir el libre ejercicio de las creencias religiosas. *Asoc. Academias y Col. Cristianos v. E.L.A.*, supra; *Treatise on Constitutional Law*, supra. Así, cuando el efecto adverso de la acción gubernamental sobre la práctica religiosa es incidental y el Estado tiene un interés legítimo y apremiante que justifique dicha acción que no pudo sustituirse por otra menos onerosa, prevalecerá el Estado. Por otro lado, cuando la acción estatal es neutral, sobre asuntos seculares y de aplicación uniforme, el Estado no tendrá que justificar un interés apremiante y prevalecerá éste siempre y cuando su efecto sobre la práctica religiosa sea incidental. *Asoc. Academias y Col. Cristianos v. E.L.A.*, supra.

Ahora bien, de lo anterior surge que efectivamente existe algún grado de tensión entre la directriz constitucional que, por un lado, prohíbe al Estado establecer una religión y, por otro lado, le impone al Gobierno la obligación de no inhibir o impedir su práctica. Ello es así ya que es posible que el Gobierno, con el fin de evitar el establecimiento de una religión, adopte medidas legislativas que tiendan a impedir su práctica. Asimismo, es concebible que un tribunal, al permitir cierto tipo de conducta por parte de algunos creyentes de una religión, en particular al amparo de la libertad de culto, tienda a promover el establecimiento de tal religión, lo cual puede chocar con la primera parte de las disposiciones constitucionales que hoy evaluamos.([15])

 Por consiguiente, al ejercer nuestra tarea judicial de adjudicar una alegación sobre violación del derecho

---

([15]) A manera de ejemplo, en *Sherbert v. Verner*, 374 U.S. 398 (1963), los contribuyentes no creyentes impugnaron que tuvieran que subsidiar una práctica religiosa si el Estado pagaba el beneficio por desempleo a un feligrés de cierto credo cuya religión no le permitía trabajar los sábados. A esto el tribunal respondió que de no otorgársele los beneficios, constituiría una carga, una penalidad, por motivo de sus creencias religiosas. Este acomodo, entendió el juez ponente (J. Brennan), no violaba la disposición constitucional contra el establecimiento de cualquier religión.

de una persona o de una institución con vínculos religiosos a practicar su culto debido a una intervención gubernamental, "debemos ser particularmente cuidadosos ... para evitar malograr el delicado equilibrio entre los dos mandatos absolutos conflictivos: el de no establecer religión alguna y el de no inhibir el libre ejercicio del culto religioso. La extensa y a veces conflictiva jurisprudencia del Tribunal Supremo federal sobre este asunto refleja las dificultades inherentes de esta delicada tarea". (Cita y escolio omitidos.) *Díaz v. Colegio Nuestra Sra. del Pilar*, supra, pág. 776.

Los hechos particulares del caso de marras requieren la aplicación de la protección de la Cláusula de Libre Ejercicio. Se nos solicita que dejemos sin efecto la destitución de las profesoras Quilichini y Mercado, y que declaremos que se infringieron derechos fundamentales de estas recurrentes. La Universidad, por su parte argumenta que la intervención del tribunal en el caso de autos en particular, violaría la Cláusula de Libre Ejercicio, pues afectaría *sustancialmente* la autonomía religiosa de la Universidad, su misión como institución educativa católica y hasta constituiría una determinación de invalidez o inaplicabilidad de los postulados de su doctrina.

En este caso, al igual que en *Díaz v. Colegio Nuestra Sra. del Pilar*, supra, y en *Agostini Pascual v. Iglesia Católica*, supra, no se trata de la impugnación de una legislación. Esta vez nos enfrentamos a una disputa *interna* entre dos (2) claustrales y una institución educativa que reclama inmunidad religiosa por su vinculación a la Iglesia Católica. Por consiguiente, el peligro de invadir el ámbito de protección constitucional radica en la intervención judicial indebida. Al igual que cualquier actuación legislativa, aquellas decisiones de los tribunales que invadan las libertades religiosas protegidas en nuestra Constitución y en la federal son inválidas. *Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190 (1960); *Shelley v. Kraemer*, 334

U.S. 1 (1948). Véase I.M. Ellman, *Driven from the Tribunal: Judicial Resolution of Internal Church Disputes*, 69 Cal. L. Rev. 1378 (1981).

La cláusula del libre ejercicio se extiende no sólo a los individuos que practican determinada religión, sino también a las organizaciones que promueven dicho culto. Debemos recordar que cualquier religión abarca elementos colectivos fundamentales para los creyentes, pues es mediante organizaciones comunales que mayormente se practica la religión. Como resultado de la naturaleza espiritual que caracteriza estas organizaciones, éstas también son favorecidas por protecciones constitucionales. Véanse: *Watson v. Jones*, 13 Wall. (80 U.S.) 679 (1871); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952).

En reconocimiento del rol prominente que tienen las organizaciones religiosas en el ámbito de la libertad de culto, el Tribunal Supremo de Estados Unidos, en *Presbyterian Church v. Hull Church*, supra, reiteró citando a *Kedroff v. St. Nicholas Cathedral*, supra, que:

> La opinión [de *Watson v. Jones*] irradia ... un espíritu de libertad para las organizaciones religiosas, una independencia de control secular, de manipulación—es decir, poder para decidir por ellos mismos, libre de interferencia por parte del Estado, en materia del gobierno de la Iglesia así como en materias relacionadas con fe y doctrina. (Traducción nuestra.) *Presbyterian Church v. Hull Church*, supra, pág. 448.

Asimismo, la importancia de las organizaciones religiosas fue acentuada por el Juez Asociado Señor Brennan cuando expresó lo siguiente:

> ... Las organizaciones religiosas, tienen un interés en mantener su autonomía en la organización de sus asuntos internos, de manera que puedan libremente:
> "seleccionar sus líderes, *definir sus propias doctrinas, resolver las disputas internas y administrar sus instituciones.* La religión incluye elementos comunales muy importantes para la mayoría de los creyentes. Éstos practican la religión mediante las organizaciones religiosas y estas organizaciones deben estar protegidas por la [C]láusula [de Libre Ejercicio]."

Para un gran número de individuos, la actividad religiosa deriva su significado en gran medida de la participación en una comunidad religiosa. Ese tipo de comunidad representa una tradición continua de principios compartidos, una entidad orgánica que no se puede reducir a un mero agregado o recopilación de los individuos que la componen. *Determinar que ciertas actividades adelantan la misión religiosa de la organización, y que dicha misión deben sólo conducirla aquellos que estén comprometidos a ello*, es por tanto una manera en que esa colectividad religiosa se define como tal. (Traducción nuestra, énfasis suplido y citas y escolio omitidos.) *Corporation of Presiding Bishop v. Amos*, 483 U.S. 327, 341–342 (1987), opinión concurrente del Juez Brennan.

Sin embargo, el mero hecho de que una actuación del Estado afecte la operación de una organización religiosa no implica que tal actuación sea automáticamente inválida a la luz de la cláusula de la Libertad de Culto. Hay que recordar que las "leyes están hechas para regir la conducta y las acciones de los ciudadanos y a pesar de que éstas no pueden intervenir con meras creencias religiosas, podrían interferir con sus prácticas". (Traducción nuestra.) *Reynolds v. United States,* supra, pág. 166, citado con aprobación en *Employment Div., Ore. Dept. of Human Res. v. Smith,* 494 U.S. 872 (1990).

En primer lugar, visto que las protecciones de la Primera Enmienda y de nuestra Constitución aplican no sólo a individuos sino también a colectividades religiosas, es procedente que comencemos por determinar si entre la Universidad y la Iglesia Católica existe un vínculo tal que convierte a la primera en una institución religiosa para luego examinar los criterios constitucionales que han demarcado los linderos de la intervención de los tribunales en sus asuntos internos. De esta manera, podemos concluir si procede que dejemos sin efecto la destitución de las profesoras.

El vínculo entre la Universidad y la Iglesia Católica es evidente y se ha caracterizado por los siguientes hechos:

Primero, fue fundada por su Excelencia Reverendísima,

Jaime E. McManus, entonces Obispo de la Diócesis de Ponce, y eregida canónicamente mediante decreto de la Sagrada Congregación para la Educación Católica como institución de educación superior *bajo la dirección de la jerarquía de la Iglesia Católica.*

Como iglesia jerárquica, la suprema autoridad de la Iglesia Católica reside en el Sumo Pontífice con sede en Roma. Colaboran con su Santidad el Papa en la administración y dirección de la Iglesia Católica varias oficinas en la Sede Apostólica o Santa Sede —ubicada en el Vaticano— entre las que se encuentran la Curia Sagrada, que consta de la Secretaría del Estado o Papal del Consejo para asuntos públicos de la Iglesia, las Congregaciones —entre ellas la Sagrada Congregación para la Educación Católica, que es la que supervisa las universidades erigidas canónicamente— los tribunales eclesiásticos, así como otras instituciones que se rigen por leyes especiales. La Sagrada Congregación para la Educación Católica de la Santa Sede aprobó los estatutos de la Universidad en 1980 y confirmó al Sagrado Dicasterio el Obispo de Ponce como Gran Canciller de la Universidad *ex officio*, para que en nombre de la Santa Sede supervise la administración de la Universidad, según los cánones del Código de Derecho Canónico y los estatutos de la Universidad. Véase *Agostini Pascual v. Iglesia Católica*, supra, pág. 178.

Segundo, la Universidad está gobernada por una Junta de Síndicos, presidida por el Arzobispo de San Juan. El Obispo de Ponce, Gran Canciller, es el representante ejecutivo de la Junta de Síndicos en la Universidad.([16])

Tercero, la misión de la Universidad es primordialmente

---

([16]) Según los Estatutos de la Universidad Católica de Puerto Rico, esta institución es gobernada por la Junta de Síndicos, la cual tiene a su cargo la supervisión de todas las operaciones de la corporación. En particular, tiene el deber de nombrar al Presidente de la Universidad sujeto a la aprobación de la Santa Sede, establecer las normas para el gobierno de la Universidad y aprobar la concesión de permanencia de los profesores. Arts. IV y V de los Estatutos de la Universidad Católica de Puerto Rico, *supra*, pág 6. De estas disposiciones surge la amplia autoridad de la Junta de Síndicos sobre los asuntos de administración y gobierno de la Universidad.

educar en armonía con los principios de la religión católica. Según surge de los Estatutos de la Universidad, dicha misión se define de la forma siguiente:

> Respondiendo a su condición de universidad católica, la Universidad Católica de Puerto Rico siente la responsabilidad de promover una sólida formación teológica en la comunidad universitaria, especialmente llevando a los alumnos a un conocimiento amplio y profundo de la fe cristiana, y a una valoración exacta y rigurosa del verdadero progreso científico y tecnológico con miras a una mejor comprensión de su alcance, en armonía con la Revelación, según es interpretada por el Magisterio Eclesiástico y respetando la auténtica libertad académica.
>
> . . . . . . .
>
> También intenta la Universidad educar a sus alumnos en la formación de una recta conciencia que les sirva de norma de bien obrar en su vida privada y pública particularmente en el ejercicio de las diversas profesiones.
>
> La Universidad Católica de Puerto Rico proyecta su influencia más allá del ámbito universitario para contribuir a la solución constructiva y justa de los problemas de la sociedad puertorriqueña. Caso Núm. RE-90-578, Parte II, pág. 162. (Proemio, Estatutos de la Universidad Católica, Edición MISION.)

Sobre dicha misión, la Carta Pastoral sobre la Educación en las Escuelas Católicas de Puerto Rico cita al Concilio Vaticano II que en su declaración de *Gravissimum Educationis* señala que " 'el futuro de la sociedad y de la misma Iglesia están íntimamente unido al desarrollo de los jóvenes que cursan estudios superiores' ". Caso Núm. RE-90-578, Parte II, pág. 271. En la consecución de ese fin, la Carta Pastoral señala, en lo pertinente a las Universidades Católicas, la necesidad que tienen éstas de no "caer en el grave peligro de una secularización ... ni en un relati-

---

En específico, la Junta se compone de los siguientes miembros de jure; (1) el Representante de la Santa Sede para Puerto Rico, quien ocupa el cargo de Presidente Honorario de la Junta; (2) el Arzobispo de San Juan, quien desempeña la posición de Presidente; (3) el Obispo de Ponce, representante ejecutivo de la Junta, Gran Canciller y Vicepresidente-Tesorero; (4) los otros Obispos de las Diócesis de Puerto Rico, y (5) el Presidente de la Universidad. Sec. 2 del Art. V de los Estatutos de la Universidad Católica de Puerto Rico, *supra.*

vismo moral o en un materialismo deshumanizante. Dejarían de ser Universidades Católicas, no serían fieles a su condición. ... *Dè ahí que es necesaria su sumisión a la Jerarquía y a la Santa Sede*". (Énfasis suplido.) Caso Núm. RE-90-578, Parte II, pág. 273. Carta Pastoral sobre la Educación en las Escuelas Católicas de Puerto Rico, Sec. IV, pág. 17.

Cuarto, los profesores tienen la obligación de velar y ser ejemplo de estos principios dogmáticos de la Iglesia. Según surge del Manual de Claustro, reglamento que cobija al magisterio de la Universidad, los profesores de la Universidad

> ... deberá(n) observar una conducta acorde con los valores y normas éticas de la Iglesia Católica (dentro y fuera de la Universidad) y ser leal a la Institución, contribuyendo positiva y eficazmente a la consecución de sus fines y objetivos. (Énfasis suprimido.) Caso Núm. RE-90-578, Parte II, pág. 203. (Memorando, Manual de Claustro, *supra*.)

Así mismo, el Manual dispone específicamente que "[c]onducta profesional o personal que viole los postulados de la doctrina y la moral de la Iglesia Católica" constituirá causal para la eventual suspensión o destitución de un miembro del claustro. Manual del Claustro, *supra*, pág. 20. Estos requisitos sobre "dogmas religiosos" que la Universidad le impone al claustro en torno a la conducta que ellos deben observar, tanto dentro como fuera de la escuela, representan un claro indicio de la importancia que para las autoridades de la Universidad tienen los profesores de esta institución en la misión de difundir el cristianismo entre los estudiantes.[17]

---

[17] La función crucial del maestro en los fines religiosos de las escuelas católicas ha sido desacada por este Tribunal en un sinnúmero de ocasiones. Véase *Díaz v. Colegio Nuestra Sra. del Pilar*, supra, pág. 781. *Academia San Jorge v. J.R.T.*, supra, pág. 207–212, opinión concurrente del Juez Asociado Señor Negrón García.

En el caso de marras, el hecho de que se trate de profesores a nivel universitario no constituye óbice para similar conclusión. Si bien es cierto que a nivel de escuela elemental, intermedia y superior, más que a nivel universitario, los niños y jóvenes están más propensos a recibir y acoger la influencia religiosa de sus superiores, y

Y, quinto, los estudiantes de bachillerato tienen que cumplir con el requisito de aprobar ocho (8) créditos en cursos de teología.

 Es preciso señalar que el anterior ejercicio va dirigido a demostrar que efectivamente la Universidad es una institución vinculada a la Iglesia Católica. No obstante, no es necesario dilucidar cómo la función de las profesoras, instructoras de inglés y ciencias secretariales, adelantan o no la misión religiosa de la Universidad Católica. Basta con que la Iglesia y, por ende, la Universidad *genuinamente* entiendan que la inobservancia por parte de sus claustrales de los preceptos que el dogma de Iglesia impone a sus fieles es incompatible con dicha misión. Un proceder contrario por parte nuestra constituiría una carga indebida sobre la institución religiosa, resultando en una interferencia no permitida por las cláusulas religiosas de nuestra Constitución y de la Constitución federal. Sobre este peligro expresaba la mayoría en *Corporation of Presiding Bishop v. Amos*, supra, pág. 336:

> ... [I]t is significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. The line is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission. Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission. (Escolio omitido.)

 Finalmente, dentro de la discusión sobre la naturaleza religiosa de la Universidad, es preciso aclarar que, contrario a lo que las recurrentes alegan, no existe en este caso acción de estado por el hecho de que los estudian-

---

estos últimos de ejercer *control total* en la educación de aquéllos, *Walz v. Tax Commission*, supra, pág. 671, no por ello instituciones como la Universidad Católica renuncian a su percepción de lo que debe ser un profesor y cómo debe desempeñarse en su misión educativa y como católico. Por ello, para efectos de la controversia ante nuestra consideración, lo relevante es el valor que la Universidad misma genuinamente otorga a sus claustrales y a su comunidad en general en el empeño de ser ejemplo de verdadero catolicismo para los estudiantes.

tes allí matriculados reciban ayuda económica para cursar sus estudios. La ayuda recibida por los estudiantes no elimina, como aducen las recurrentes, el carácter religioso de la Universidad. Ese tipo de ayuda generalizada, para educación superior, pertenece a los estudiantes, y la decisión de emplear dichos fondos en una institución de educación superior de carácter religioso no necesariamente vulnera el principio que prohíbe el establecimiento de cualquier religión. La decisión del lugar en que emplearán los fondos es de los estudiantes universitarios y serían éstos quienes estarían apoyando una religión en particular. *Witters v. Wash. Dept. of Services for Blind*, 474 U.S. 481 (1986). Por lo tanto, puede ser compatible el otorgamiento de ayuda gubernamental a estudiantes quienes la utilicen en instituciones de educación superior con vínculos religiosos sin que por ello se conviertan estas últimas en brazos del Estado ni se elimine el vínculo religioso de dichas instituciones.

Argumentan las recurrentes, como fundamento adicional para invalidar el despido, la admisión por parte de la Universidad de que recibe fondos gubernamentales federales. Sostienen que debido a ello la Universidad no debería tener el beneficio de "inmunidad" que ofrecen las cláusulas religiosas de la Constitución.

■ La parte recurrente no impugna el otorgamiento de los fondos federales a la Universidad, como tampoco cuestiona la ayuda otorgada a los estudiantes. Sencillamente, lo que pretende es que resolvamos que la Universidad es una organización privada secular, no cobijada por las cláusulas religiosas, porque de otra forma las agencias federales nunca hubieran determinado que la Universidad cualificaba para recibir fondos. Este argumento no encuentra apoyo en la legislación y jurisprudencia federal que, con ciertas excepciones, ha validado la asignación de fondos públicos federales a instituciones educativas de afiliación religiosa. Sólo ha prohibido totalmente este tipo de

ayuda a las "escuelas o departamentos de divinidad", propiamente seminarios, y para la construcción de edificios destinados a la educación puramente sectaria o para actividades de adoración y culto. *Tilton v. Richardson*, 403 U.S. 672 (1971); *Bradfield v. Roberts*, 175 U.S. 291 (1899).

Visto el vínculo de la Universidad con la Iglesia Católica, nos corresponde revisar si existe un interés legítimo y apremiante del Estado para intervenir en la controversia. Cuando se cuestiona una actuación gubernamental en una situación de intervención específica, que no sea generalizada y neutral, sobre una parte que reclama protección bajo la cláusula de libre ejercicio, dicha parte puede prevalecer si establece que se le impondría un gravamen o carga sustancial al ejercicio de su religión o que no existe un interés público apremiante del Estado protegido de la manera menos onerosa a la religión. Véanse, en general: *Asoc. Academias y Col. Cristianos v. E.L.A.*, supra; *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993); *Employment Div., Ore. Dept. of Human Res. v. Smith*, supra; *Wisconsin v. Yoder*, 406 U.S. 205 (1972). Tenemos que admitir que en este caso nuestra intervención no constituye una actuación estatal de aplicabilidad generalizada y neutral, es decir, "que reca[iga] uniformemente sobre todo un género de actividades ...". *Asoc. Academias y Col. Cristianos v. E.L.A.*, supra, págs. 160–161. Nuestra intervención recaería sobre un asunto *interno* de una universidad afiliada a la Iglesia Católica que solamente a ésta afectaría.

Según alegan las recurrentes, el interés que debemos proteger es el derecho al matrimonio como vertiente del derecho a la intimidad por encima del mandato del Art. II, Sec. 3 de la Constitución del E.L.A., *supra*, y de la Primera Enmienda de la Constitución federal. Efectivamente, reconocemos no solamente la trascendencia del derecho a la intimidad, sino el valor y la importancia del matrimonio como fuente de familia.

... [S]eguimos valorando la familia matrimonial como el régimen socialmente más deseable. Además, en nuestro país existe una clara política pública de protección y fortalecimiento de la familia, y el matrimonio es el paso inicial para su formación. *Sostre Lacot v. Echlin of P.R., Inc.*, 126 D.P.R. 781, 791 (1990), voto particular del Juez Asociado Señor Negrón García.

El divorcio, como vertiente del derecho a la intimidad, también ha sido reconocido por este Tribunal en *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978). Allí expresamos que, aunque sujeto a la corroboración de que la decisión de divorciarse no sea producto del capricho, la irreflexión o de la coacción de los cónyuges, el "Estado está impedido ... de obligar a dos seres humanos a permanecer atados cuando ambos reconocen que la convivencia entre ellos se ha hecho imposible". Íd., pág. 275. Por lo tanto, es nuestro deber velar por que el interés del Estado de proteger el matrimonio y el derecho al divorcio no sean coartados. Efectivamente, gracias a estas protecciones y reconocimientos, y una vez cumplidos los respectivos requisitos para el matrimonio y el divorcio, las recurrentes pudieron contraer nuevas nupcias sin que siquiera la Iglesia Católica pudiera impedírselo o impugnar la legitimidad *civil* de estos vínculos.

Por lo tanto, aducen las recurrentes que proteger el matrimonio es un interés apremiante del Estado. Sin embargo, hemos visto que la existencia de este interés no es suficiente para justificar nuestra interferencia con la libertad de culto de la Universidad como institución de afiliación religiosa, cuando tal actuación de nuestra parte pueda significar un gravamen o carga sustancial a dicha institución violando la cláusula de libre ejercicio.[18]

---

[18] En este punto conviene señalar que este caso no presenta cuestión alguna de discrimen en el empleo por razón de matrimonio entre empleados de la misma empresa o negocio, proscrito por la Ley Núm. 100 de 30 de junio de 1959, según enmendada por la Ley Núm. 116 de 20 de diciembre de 1991 (29 L.P.R.A. sec. 146 *et seq.*). Las personas con las cuales contrajeron matrimonio las recurrentes no eran empleados de la Universidad.

■ Cuando examinamos los hechos particulares de este caso, nos damos cuenta de que en realidad lo que solicitan las recurrentes es que, tras ellas ejercer debidamente sus derechos, se le imponga a la Universidad la obligación de reconocer, *dentro de su esfera de acción*, los matrimonios de las profesoras Quilichini y Mercado. Es decir, que la Universidad actúe contrario a los postulados de la doctrina Católica. En términos contractuales, esto significa que no pueda poner en vigor las causales de despido que se incluyen en el Manual del Claustro y en los contratos anuales de facultad. Esta inclusión, vimos anteriormente, obedece a un mandato que se encuentra en el Código de Derecho Canónico. Esto significa que, de adentrarnos a determinar si como parte de las causas de despido la Universidad puede incluir aquella "conducta profesional o personal que viole los postulados de la doctrina y la moral de la Iglesia Católica", estaríamos llevando a cabo un *juicio valorativo sobre la sabiduría del mandato canónico a las universidades católicas* e interfiriendo con el llamado de "sumisión a la jerarquía y a la Santa Sede" según expresado en *Gravissimum Educationis*, supra. Para la Iglesia Católica y sus instituciones educativas afiliadas, éste es un asunto esencialmente comprendido dentro del dogma de la Iglesia, cuya observancia exigirán de aquellos que impartan la enseñanza en sus universidades. No se nos ocurre una instancia más clara de intromisión en asuntos de dogma, fe y autonomía religiosa.

Si resolviésemos que en el contexto interno de sus profesores, la Universidad no puede tomar acción disciplinaria cuando uno de éstos incurra en lo que la Iglesia considera conducta constitutiva de violación a sus dogmas, entonces, *como organización religiosa*, la Iglesia no podría cumplir su misión de orientar su labor de enseñanza alrededor de los principios que promulga. Es decir, como consecuencia de nuestra intervención, perdería sustancialmente su autoridad para poder dirigir dicha institución a base de sus principios religiosos en un área tan importante como lo es

la labor magisterial que lleva a cabo el Claustro en todo tipo de materia de enseñanza.

██ Más aún, además de las consecuencias prácticas que podría acarrear nuestra actuación, la determinación judicial invalidando, directa o indirectamente, postulados de la doctrina claramente establecida de una religión es, *en sí* misma, una carga sustancial a dicha religión. Una vez determinado que no hubo incumplimiento de contrato por parte de la Universidad por haber mediado consentimiento válido de las partes, no nos corresponde pasar juicio sobre la "bondad" o "injusticia" de las creencias religiosas incluidas en el contrato como causa de despido.

De manera que si las profesoras *voluntaria y libremente* aceptaron formar parte del claustro de la Universidad, sujetas a las condiciones de no violar los postulados de la doctrina y la moral de la Iglesia Católica, no pueden acudir ante los tribunales civiles para que invalidemos la decisión de la Universidad Católica, motivada por dichos dogmas y creencias religiosas. Ellas aceptaron someterse a estas creencias, como claustrales y como católicas.[19]

Al determinar que las causas de destitución de los claustrales obedecen *genuinamente* a postulados impuestos sobre la Universidad por las autoridades de más alta jerarquía dentro de la Iglesia Católica, y según reflejado en el documento legislativo principal de la Iglesia Católica, el Código de Derecho Canónico, es nuestro deber no interferir con éstas. Otorgar tal deferencia ha sido afirmado por este Tribunal y por la jurisprudencia del Tribunal Supremo federal que tiene su génesis en el caso *Watson v. Jones*, supra; *Agostini Pascual v. Iglesia Católica*, supra. Véanse,

---

[19] Muy bien señaló el tribunal de instancia, al hacer referencia a la voluntaria pertenencia o vinculación con una entidad religiosa, que esto acarrea "ciertos derechos y obligaciones de sus miembros, los cuales son regulados a través de sus códigos, normas y reglamentos, especialmente en lo referente a ... matrimonios, concepción humana ... divorcios, etc. ....". (Sentencia de 9 de julio de 1990, Hon. Leida González Degró, pág. 13.) Caso Núm. RE-90-578, Parte I, Solicitud de revisión, Apéndice, pág. 14.

además: *Serbian Orthodox Diocese v. Milivojevich*, supra; *Presbiterian Church v. Hull Church*, supra; *Kedroff v. St. Nicholas Cathedral*, supra.

Finalmente, es procedente aclarar que aunque en un caso anterior ante este Tribunal expresamos el valor superior del derecho a la intimidad frente al planteamiento de inmunidad religiosa, dicho caso es distinguible del de autos. Nos referimos a *Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20 (1974). Allí no nos enfrentamos a planteamientos de validez de doctrina religiosa. En aquella ocasión, acudieron solicitando un remedio miembros de una comunidad que se vieron afectados en su derecho a la paz y tranquilidad de sus hogares por las actuaciones de una entidad religiosa que durante la celebración de sus reuniones, mantenían el volumen de sus altoparlantes a un nivel excesivo. Así, al adjudicar aquella controversia no nos enfrentamos ni remotamente a los hechos hoy ante nuestra consideración. Por lo tanto, es incorrecto generalizar, como hacen las recurrentes, y expresar que las protecciones y prohibiciones de las cláusulas religiosas *siempre* tienen que ceder ante el derecho a la intimidad. Nuestra función de proteger todos los derechos e intereses en conflicto requiere un cauteloso examen de los casos de esta naturaleza según los hechos particulares de cada uno.

En conclusión, no erró el tribunal de instancia al aplicar las disposiciones reglamentarias de la Universidad que imponían a los profesores, como requisito para permanecer en el empleo, la obediencia a las normas, valores y postulados de la doctrina y la moral de la Iglesia Católica.

*Se dictará sentencia de conformidad con lo anteriormente resuelto.*

Los Jueces Asociados Señor Rebollo López y Señora Naveira de Rodón no intervinieron.