Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| | | |
|---|---|---|
| *JOSUÉ LAGUNA RÍOS*<br><br>*Recurrente*<br><br><br>v.<br><br><br>ICONIC REALTY GROUP, LLC.<br>MONEY HOUSE, INC.<br>FIRST BANK PUERTO RICO<br><br>*Recurridos* | KLRA202400506 | Revisión Administrativa procedente del Departamento de Asuntos del Consumidor<br><br>Querella Núm.:<br>SAN-2023-0017495<br><br>Sobre:<br>Bienes Raíces Ley 10 |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Adames Soto y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 14 de marzo de 2025.

El 13 de septiembre de 2024, compareció ante este Tribunal de Apelaciones, el señor Josué Laguna Ríos, (parte recurrente o señor Laguna Ríos), mediante *Revisión Administrativa* en la cual nos solicita la revisión de la *Resolución* emitida el 7 de agosto de 2024, notificada el 8 de agosto de 2024, por el Departamento de Asuntos del Consumidor (parte recurrida o DACo).

Adelantamos que, por los fundamentos que a continuación se esbozan, **revocamos** el dictamen recurrido.

## I.

El recurso de autos tiene su génesis cuando el señor Laguna Ríos presentó ante el DACo una *Querella* en contra de Iconic Realty Group LLC (Iconic), FirstBank de Puerto Rico (FirstBank) y Money House Inc. (Money House), al amparo de la Ley 10-1994, conocida como la *Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces en*

*Puerto Rico*[1]. En la aludida *Querella,* el señor Laguna Ríos solicitó la devolución del dinero pagado por concepto de depósito, así como la implementación de multas; esto, por haber recibido un asesoramiento inadecuado del corredor de bienes raíces, Iconic[2].

Alegó que, el 9 de septiembre de 2022, se comunicó con una vendedora de Iconic, llamada Nichole Mojica (señora Mojica), con relación a una propiedad en venta. Le adelantó a dicha empleada que tenía una precualificación de Money House y que ya había obtenido la certificación del curso del Departamento de la Vivienda para la ayuda de la compra del primer hogar. Adujo, además, que la señora Mojica le solicitó la carta de precualificación del banco Money House, la cual le envió y procedieron a ver la propiedad. Alegó que, luego de realizar algunos procedimientos, le hizo una oferta al dueño de la propiedad, FirstBank. La propiedad estaba valorada en setenta mil dólares ($70,000.000), y procedió a entregar un depósito de mil seiscientos dólares ($1,600.00) a la señora Mojica. Añadió, que en algún momento habló con un empleado de Money House de nombre Carlos Santiago (señor Santiago) y este le informó que no cualificaba para el préstamo por las deudas e ingresos que tenía. Que el señor Santiago le sugirió que buscara un codeudor. Así las cosas, el señor Laguna Ríos informó que posiblemente el codeudor podía ser su hermana. No obstante, la hermana le indicó que no podía ser codeudora porque tenía el crédito comprometido. Esbozo el señor Laguna Ríos que aun así remitió la documentación solicitada. Ante el hecho de no conseguir codeudor, el señor Laguna Ríos llamó a la empleada de Iconic, señora Mojica, para informarle sobre esta situación, y esta le solicitó una carta de cancelación. Money House realizó la carta de cancelación. Adujo que entregó la carta de Money

---

[1] 20 LPRA secc. 3025.

[2] Véase *Revisión Administrativa, anejo Querella* presentada por la parte recurrente, modifica el petitorio a saber el pago de la indemnización más una partida por daños mentales que asciende a dos mil dólares.

House al FirstBank. No obstante, FirstBank le notificó que no le podían devolver el depósito porque él había cancelado el préstamo. En vista de ello, solicitó en Money House una nueva carta sobre denegación. Sin embargo, Money House le contestó que no podía entregarle una carta de denegación porque no hubo ninguna originación del préstamo.

El 9 de febrero de 2024, Iconic presentó *Contestación a Querella.* En síntesis, alegó que no existe una relación contractual entre las partes y afirmó que hubo una comunicación preliminar con el recurrente para ver una propiedad debido a que tenía una carta de precualificación de crédito de Money House. Finalmente, razonó que no cometió una actuación u omisión negligente o culposa.

Ese mismo día, el FirstBank presentó su *Contestación a Querella.* A modo de sinopsis, alegó que el 13 de octubre de 2022, el señor Laguna Ríos y el FirstBank otorgaron un Contrato de Compraventa, mediante el cual el recurrente se obligó a comprar la propiedad objeto del contrato y entregó un depósito de Mil seiscientos dólares ($1,600.00). Que posteriormente, con fecha del 22 de noviembre de 2022, el señor Laguna Ríos entregó una carta en la cual informaba que deseaba cancelar el proceso de compra del hogar porque la persona que iba a ser codeudor no pudo ser parte del proceso y solicitó la devolución del depósito. FirstBank se negó a devolverle el depósito y esbozó que las cláusulas del contrato firmado por las partes no permitían ese tipo de devolución del depósito[3].

El 29 de febrero de 2024, el DACo emitió una *Resolución Parcial por Desistimiento*[4], en la cual desestimó la querella contra Money House Inc. a petición de la parte recurrente.

---

[3] Money House presentó Contestación a Querella, sin embargo, el documento presentado por el recurrido está incompleto.
[4] El 8 de noviembre de 2024 solicitamos al DACo que sometiera copia certificada del expediente administrativo. Dicha resolución obra en el referido expediente.

Luego de los trámites de rigor, el 2 de mayo de 2024, se celebró la vista administrativa ante el DACo y, el 7 de agosto de 2024, el DACo emitió *Resolución,* notificada el 8 de agosto de 2024, en la que declaró No Ha Lugar la querella y ordenó el cierre y archivo. En la *Resolución,* consignó las siguientes *Determinaciones de Hechos:*

1. La querella de epígrafe se presentó ante este Departamento el 19 de diciembre de 2023. En la misma se solicitó que declaremos nulo el contrato de Compraventa otorgado ente el querellante y Firstbank por no habérsele explicado las cláusulas y condiciones, la devolución del depósito otorgado más indemnización monetaria.

2. La parte querellante de epígrafe alega en su querella que allá para el 9 de septiembre de 2022, se comunicó con la firma Iconic Realty Group LLC para indagar sobre la propiedad que quería comprar perteneciente a First Bank PR.

3. El 13 de octubre de 2022, el querellante y First Bank suscribieron un contrato intitulado Contrato de Compraventa (en adelante el Contrato), mediante el cual el Querellante se comprometió a comprar la propiedad localizada en Barrio Guaraguao Abajo en Bayamón, Puerto Rico con los siguientes datos registrales: Finca Número 80978, inscrita al folio 158 del tomo 1958 de Bayamón Sur, Registro de la Propiedad de Puerto Rico, Sección 1 de Bayamón.

4. En el Contrato se pactó que el precio de compraventa sería de $70,000.00 y que, al firmar el Contrato, el querellante entregaría la cantidad de $1,600.00 como depósito lo cual hizo el mismo día 13 de octubre de 2022.

5. El contrato establece en su artículo once, en lo pertinente, lo siguiente:
    a. Cuando la Parte Compradora se negare o desistiere de otorgar la escritura de compraventa dentro del término estipulado en el artículo dos de este Contrato, en cuyo caso el Banco tendrá derecho a retener la totalidad (o el 100%) del depósito que se entrega con la firma de este Contrato según establecido en el artículo uno.

6. La parte querellante gestionó el financiamiento de la propiedad con Money House quien le otorgó una carta de precalificación sujeta a la aprobación futura de darse las condiciones para eso.

7. Que antes de formalizarse los documentos de solicitud de préstamo hipotecario con Money House personal de la compañía le sugirió que debía conseguir un codeudor para que se le aprobara el mismo.

8. Al no tener un codeudor el querellante no presentó solicitud de financiamiento con Money House ni ninguna otra entidad.

9. El querellante le solicitó a Money House una carta de denegación de préstamo, pero le indicaron que no es posible emitir la misma ya que ni siquiera hubo solicitud de este.

10. El 28 de noviembre de 2022, el querellante le envío carta a First Bank mediante la cual notificó lo siguiente:
    "Por este medio yo, Josué Launa Ríos, deseo cancelar proceso de compra del hogar que fue opcionado ya que

la persona la cual iba a ser co-deudor por motivos personales no puede ser parte del proceso. La misma era importante para completar el proceso de compra. Desafortunadamente, me veo forzado a posponerlo en un futuro. Les agradezco la orientación y la asistencia en el proceso. Solicito amablemente me dejen saber si hay alguna devolución referente al dinero pagado en adelanto".

11. Que, tras solicitar la devolución del depósito, First Bank le indicó que, de conformidad con el contrato, no procedía la devolución del depósito toda vez que el Sr. Laguna Ríos desistió voluntariamente de la transacción.

12. En la vista evidenciaria el Sr. Laguna indicó que sabe leer y escribir y no tiene ningún impedimento para hacerlo, pero aun así no leyó el contrato cuando tuvo el documento a su disposición.

13. El señor Laguna admitió que no leyó el contrato hasta que le denegaron la solicitud de devolución de depósito.

14. El contrato objeto de la controversia no adolece de vicio alguno, sus términos y condiciones son claros, libre de ambigüedades y, por consiguiente, vinculante.

En consonancia con las determinaciones de hechos antes esbozadas y al palio del derecho vigente, la agencia recurrida concluyó que: las cláusulas del contrato firmado por el recurrente y FirstBank son claras, explícitas y libre de ambigüedad. Que el artículo del contrato textualmente dispone las condiciones para la devolución del depósito las cuales no fueron cumplidas por la parte recurrente.

En desacuerdo con lo dictaminado, el 16 de agosto de 2024, el señor Laguna Ríos, presentó ante el DACo, *Moción de Reconsideración*. La misma fue declarada No Ha Lugar el 22 de agosto de 2024.

Nuevamente insatisfecho, el recurrente acudió ante este foro revisor y le imputó a la agencia recurrida la comisión de los siguientes errores:

**Primer Error**: Erró el Hon. juez al actuar con perjuicio y parcialidad en craso abuso de su discreción, al no permitir interrogatorio al compareciente de la auto representación mediante el mecanismo motu proprio al no cumplir con la norma procesal, privando al querellante de un debido proceso de Ley de su derecho a ser oído.

**Segundo Error**: Erró el Hon. juez al no plantear en su análisis de hechos que la intermediaria en la transacción de contrato de compraventa fue Nichole Mojica vendedora de

Iconic Realty y no meramente una comunicación entre Firstbank y el querellante, no surge del expediente ni testimonios que el querellante Josué Laguna Ríos se comunicó con [F]irstbank y estos mercadearon y mostraron la propiedad.

**Tercer Error**: Erró el Hon. juez no plantear que Nichole Mojica actuó conforme a la definición de *corredor de bienes raíces* y a esta se le entregó un cheque de $1,600 dólares a pesar de que entre Iconic Realty y el querellante no firmaron un contrato de corretaje y según la representación legal de Iconic, alegaron no tenían ninguna obligación ni el deber de orientar con el querellante y no lo depositó en una cuenta especial como lo establece el Artículo 21.-Cuentas de Plica-"Cuenta Especial". – (20 LPRA § 3044) [Ley 10-1994, según enmendada].

**Cuarto Error**: Erró el Hon. juez al hacer alusión que el querellante pudo haber solicitado en varias entidades financiamiento cuando en el contrato surge que es **cualquier entidad**. No obstante, el Hon. juez reconoció que el querellante **gestionó** el financiamiento de la propiedad con Money House en su relación de hechos núm. 6.

**Quinto Error**: Erró el Hon. juez que el querellante no presentó solicitud de financiamiento con Money House cuando surge de la contestación a la querella el 6 de febrero de 2024, los mismos expresaron lo siguiente: DEFENSAS AFIRMATIVAS 2. El querellante no cumplió con los requisitos financieros necesarios para cualificar para el financiamiento de la propiedad específica que interesaba adquirir. 5. En cuanto a las alegaciones que: 1.) el querellante se comunicó con Carlos Santiago, **originador** de Money House, 2.) que éste le indicó que no cualificó por sus deudas e ingresos y que buscara un codeudor, y 3.) que el querellante le indicó que su hermana podría ser la opción, se aceptan las mismas. 7. En cuanto a la alegación que el querellante **procedió a enviar todos los documentos pertinentes y con diligencia** en lo que podía conseguir codeudor, se acepta la misma. 10. Se alega afirmativamente y se aclara que el querellante **no cumplió con los requisitos financieros** necesarios para el financiamiento de la propiedad específica que interesaba adquirir.

**Sexto Error**: erró el Hon. juez al plantear que el querellante envió carta a Firstbank **contrario** a lo testificado en vista y redactado en la querella inicial, Nichole Mojica le requirió al querellante redactar la misma cancelando por no cualificar al financiamiento para ella enviársela a Firstbank hechos corroborable en videncia que obra en el expediente, mensaje de texto del 1 de diciembre de 2022 en el cual el querellante validó el recibo de la carta, ya enviada a Fristbank le indica al querellante que al no ser una carta de denegación no devolverían el depósito.

El 18 de septiembre de 2024, emitimos *Resolución* en la cual concedimos un plazo a la parte recurrida para presentar su posición sobre los méritos del recurso. El 31 de octubre de 2024, FirstBank e Iconic, en conjunto, sometieron el *Alegato en Oposición a Recurso de Revisión Judicial.*

Evaluado minuciosamente el expediente, nos encontramos en posición de adjudicar.

**II.**

**-A-**

*"Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces en Puerto Rico"* Ley Núm. 10 de 26 de abril de 1994, según enmendada[5] (Ley Núm. 10-1994), regula el negocio de bienes raíces y la profesión del corredor[6]. El Artículo 2, inciso (e), de la Ley Núm. 10-1994[7], establece que un contrato de corretaje "es aquel mediante el cual una persona, a cambio de una retribución, se obliga a prestarle servicios a otra como intermediario con un tercero para llevar a cabo una transacción de bienes raíces, según definida en esta Ley". El inciso (t) del citado artículo dispone que una transacción de bienes raíces es:

> [...] cualquier contrato, de compraventa, promesa de venta, opción de compra o venta, permuta, **arrendamiento**, subasta, administración de propiedades, o el ofrecimiento, promoción o negociación de los términos de una venta, opción de compraventa, promesa de compraventa, **alquiler**, subasta, administración, permuta de bienes inmuebles localizados en o fuera del Estado Libre Asociado de Puerto Rico, donde sirva de intermediario un Corredor, Vendedor o Empresa de Bienes Raíces. (Énfasis nuestro)[8].

Como ha expresado el Tribunal Supremo en reiteradas ocasiones, dicho contrato de corretaje es de naturaleza *sui generis*[9]. Aunque no estaba regulado por el Código Civil de 1930, el mismo se regía por las disposiciones del Código Civil de 1930 atinentes al contrato de mandato por estar íntimamente relacionado a esa figura jurídica. *Íd.* Actualmente en el Código Civil 2020 regula el contrato de corretaje[10], no obstante, las disposiciones de este capítulo son

---

[5] 20 LPRA secc. 3025, *et. seq.*
[6] *Íd.*
[7] *Íd.*
[8] *Íd.*
[9] *Meléndez Guzmán v. Berríos López*, 172 DPR 1010, 1022-1023 (2008).
[10] 31 LPRA seccs. 10411-10415.

inaplicables en los casos de aquellos agentes cuya actividad está regida por una ley especial[11].

Ciertamente hay tres tipos de contratos de corretaje principales reconocidos a saber: los exclusivos, los semiexclusivos y los abiertos[12]. En un contrato de corretaje exclusivo, el cliente "le concede al corredor o empresa de bienes raíces la autorización única y exclusiva para actuar como intermediario en representación de este para ofrecer, promocionar y negociar determinada transacción de bienes raíces"[13]. En el contrato semiexclusivo, el dueño "no renuncia a su facultad de realizar gestiones para perfeccionar la transacción de bienes raíces por sí mismo"[14]. Mientras que, en el contrato de corretaje abierto el cliente "se reserva la facultad de contratar el número de corredores que desee"[15].

La función de un corredor de bienes raíces consiste en ser un intermediario en transacciones de compraventa, promesa de venta, opción de compra o venta, permuta, arrendamiento, subasta, administración de propiedades, o en el ofrecimiento, promoción o negociación de los términos de alguna de dichas transacciones. Artículo 2 (g) de la Ley Núm. 10-1994[16]. No obstante, no se considerará que una persona ejerce como corredor de bienes raíces en aquellas transacciones en las que sea titular del bien inmueble o actúe a beneficio propio y no como intermediaria. El corredor de bienes raíces no es parte en los contratos, más bien recibe una retribución a título oneroso pactada previamente[17].

---

[11] 31 LPRA secc. 10413.

[12] *S.L.G. Rodríguez-Rivera v. Bahía Park*, 180 DPR 340, 356-357 (2010).

[13] *Íd.*, pág. 357, citando a R. Cintrón Perales, *El Contrato de Corretaje de Bienes Raíces y Opción de Compraventa de Propiedades Residenciales*, San Juan Puerto Rico, Ed. Situm, 2006, págs. 87-88.

[14] *Íd.*

[15] *Íd.*

[16] 20 LPRA secc. 3025.

[17] Véase, L. Rivera Pagán, *La figura del Corredor de Bienes Raíces como intermediario en los contratos de opción de compra o venta a la luz de la Ley Núm. 10 de 25 de abril de 1994. Análisis Jurisprudencial: Vélez López v. Izquierdo Stella*. 45 REVDP 13 Vol. 1 (2005).

Por otro lado, el Artículo 31 de la Ley Núm. 10- 1994, establece los actos o prácticas proscritas. Entre estas, el inciso (9) del citado artículo prohíbe: "[r]ealizar con cualquier parte un contrato de corretaje exclusivo o semi exclusivo, sin explicarle los términos y condiciones del mismo, y su fecha de vencimiento; disponiéndose que no será permitidas las cláusulas de renovación automáticas en los contratos de corretaje"[18].

En otro extremo, el Artículo 4 del Reglamento Núm. 5571, del 3 de abril de 1997, pág. 2 (Reglamento Núm. 5571 o Reglamento de Ética de la Junta de Corredores, Vendedores y Empresas de Bienes Raíces), regula la conducta ética requerida al corredor y vendedor de bienes raíces- responsabilidad del corredor y vendedor. Como parte de ésta, las secciones 2, 3, 4 y 10 establecen la conducta a cumplir por los corredores de bienes raíces a saber: *"Proteger y defender los intereses de su cliente principal sin lesionar los intereses de los demás, no buscar obtener ventajas injustas y conducir sus negocios de forma que evite controversias con los demás, ser lo más claro posible al hacer la promoción de las propiedades que está mercadeando"*[19].

**-B-**

Es normativa reiterada que, las obligaciones nacen de la ley, de los contratos y cuasicontratos, de los actos ilícitos, u omisiones en que interviene culpa o negligencia, y cualquier otro acto idóneo para producirlas[20]. Los contratos se perfeccionan cuando median el objeto, consentimiento y causa[21]. El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa o prestar algún servicio[22].

---

[18] 20 LPRA secc. 3054.
[19] Reglamento Núm. 557.
[20] 31 LPRA secc. 8984.
[21] 31 LPRA secc. 9771.
[22] 31 LPRA secc. 9772, *Aponte Valentín v. Pfizer Pharms., LLC,* 2021 TSPR 148 (2021).

En nuestro ordenamiento jurídico se ha reconocido el principio de libertad de contratación, el cual permite a las partes pactar los términos y condiciones que tengan por convenientes[23]. No obstante, tal libertad no es infinita, puesto que, encuentra su límite en el Art. 304 del Código Civil[24]. El referido artículo dispone que, los términos y condiciones que las partes establezcan serán válidas cuando no sean contrarias a la ley, la moral, ni al orden público. Una vez perfeccionado el contrato, lo acordado tiene fuerza de ley entre las partes, "y desde entonces obligan, no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conforme a la buena fe, al uso y a la ley"[25]. Los tribunales estamos facultados para velar por el cumplimiento de los contratos, y no debemos relevar a una parte del cumplimiento de su obligación contractual cuando tal contrato sea legal, válido y no contenga vicio alguno[26].

**-C-**

La *doctrina del abuso* del derecho que permea todo nuestro ordenamiento, así como el *principio general de la buena fe*, persiguen como finalidad impedir que el texto de una ley sea utilizado para amparar actos contrarios a la realización de la justicia y que frente al contenido ético y al espíritu objetivo de la norma legal, no prevalezcan las maniobras tendentes a lograr un resultado distinto al perseguido con ella[27].

Es por ello que, en nuestra jurisdicción rige el principio de que una parte debe ejercer sus derechos de conformidad con las

---

[23] *Burgos López et al. v. Condado Plaza*, 193 DPR 1, 7-8 (2015); *Arthur Young & Co. v. Vega III*, 136 DPR 157 (1994).

[24] 31 LPRA secc. 6242. *Burgos López et al. v. Condado Plaza, supra*, págs. 7-8; *Oriental Bank v. Perapi*, 192 DPR 7, 15 (2014).

[25] 31 LPRA secc. 9754, *Aponte Valentín v. Pfizer Pharms., supra*; *Burgos López et al. v. Condado Plaza, supra*, pág. 8.

[26] *Mercado, Quilichini v. UCPR*, 143 DPR 627 (1997).

[27] *Soriano Tavárez v. Rivera Anaya*, 108 DPR 663, 673-674 (1979).

exigencias del debido proceso de ley[28]. De lo contrario, nuestro ordenamiento sanciona *"el abuso del derecho o su ejercicio antisocial"*[29]. El Tribunal Supremo de Puerto Rico acogió la doctrina del derecho civil sobre el *abuso del derecho* en *Soriano Tavárez vs. Rivera Anaya*[30], allí afirmó que:

> *[e]l abuso del derecho, la mala fe y el fraude a la ley … persiguen … impedir que el texto de la ley sea utilizado para amparar actos contrarios a la realización de la justicia; que frente al contenido ético y al espíritu objetivo de la norma legal no prevalezcan las maniobras tendentes a lograr un resultado distinto al perseguido con ella*[31].

**-D-**

Los tribunales apelativos debemos otorgar amplia deferencia a las decisiones emitidas por las agencias administrativas, puesto que, estas cuentan con vasta experiencia y pericia para atender aquellos asuntos que se les han sido delegados por la Asamblea Legislativa[32]. Es por ello, que, tales determinaciones suponen una presunción de legalidad y corrección, que a los tribunales nos corresponde respetar, mientras la parte que las impugne no presente prueba suficiente para derrotarlas[33]. No obstante, tal norma no es absoluta, es por lo que, nuestro Máximo Foro ha enfatizado que no podemos imprimirle un sello de corrección, so pretexto de deferencia a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho.

En *Torres Rivera v. Policía de Puerto Rico*, 196 DPR 606, 628 (2016), nuestro Tribunal Supremo resumió las normas básicas en torno al alcance de la revisión judicial de la forma siguiente:

---

[28] *Fraguada Bonilla v. Hosp. Aux. Mutuo*, 186 DPR 365, 409 (2012). *Véase, además*; *Soriano Tavárez v. Rivera Anaya, supra*, 670; *El Vocero de PR v. Hernández Agosto*, 133 DPR 413, 415 (1993).

[29] *Soriano Tavárez v. Rivera Anaya, supra.*

[30] *Íd.*

[31] *Soriano Tavárez v. Rivera Anaya, supra*, a las págs. 673–674.

[32] *Oficina de Ética Gubernamental v. Martínez Giraud*, 2022 TSPR 93 (2022); *Super Asphalt v. AFI y otros*, 206 DPR 803, 819 (2021); *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 126 (2019); *Rolón Martínez v. Supte. Policía*, 201 DPR 26,35 (2018); *Torres Rivera v. Policía de PR*, 196 DPR 606, 626 (2016); *Asoc. Fcias. v. Caribe Specialty et al. II*, 179 DPR 923, 940 (2010).

[33] *Íd.*; *Oficina de Ética Gubernamental v. Martínez Giraud, supra*; *Batista, Nobbe v. Jta. Directores,* 185 DPR 206, 216 (2012).

[L]os tribunales deben deferencia a las decisiones de una agencia administrativa, pero tal deferencia cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que, **si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos procede que se valide la interpretación que realizó la agencia administrativa recurrida**. (Énfasis suplido).

El criterio rector bajo el cual los tribunales deben revisar las decisiones administrativas es el criterio de razonabilidad[34]. Bajo este criterio, se limita la revisión judicial a dirimir si la agencia actuó de forma arbitraria o ilegal, o de manera tan irrazonable que su actuación constituya un abuso de discreción[35].

Bajo este supuesto, la Sec. 4.5 de la Ley Núm. 38 del 30 de junio de 2017[36], conocida como la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAUG), "estableció el marco de revisión judicial de las agencias administrativas"[37]. La intervención del tribunal se limita a tres áreas, a saber: (1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial que obra en el expediente administrativo visto en su totalidad, y (3) si las conclusiones de derecho del ente administrativo fueron correctas[38].

Nuestro Máximo Foro, ha expresado que, esta intervención "debe ocurrir cuando la decisión administrativa no se fundamente

---

[34] *Oficina de Ética Gubernamental v. Martínez Giraud, supra*; *Super Asphalt v. AFI y otros, supra*, pág. 820; *Graciani Rodríguez v. Garaje Isla Verde, supra*, pág. 127; *Torres Rivera v. Policía de PR, supra*, pág. 626.

[35] *Íd.*; *Oficina de Ética Gubernamental v. Martínez Giraud, supra*; *Super Asphalt v. AFI y otros, supra*, pág. 819-820; *Graciani Rodríguez v. Garaje Isla Verde, supra*, pág. 127; *Rolón Martínez v. Supte. Policía, supra*, pág. 36; *Batista, Nobbe v. Jta. Directores*, pág. 216.

[36] 3 LPRA 9675.

[37] *Rolón Martínez v. Supte. Policía, supra*, pág. 35.

[38] *Íd.*, págs. 35-36; *Oficina de Ética Gubernamental v. Martínez Giraud, supra*; *Torres Rivera v. Policía de PR, supra*, págs. 626-627; *Nobbe v. Jta. Directores, supra*, pág. 217; Sec. 4.5 de la LPAUG, 3 LPRA secc. 9675.

en evidencia sustancial o cuando la agencia se equivoque en la aplicación de la ley"[39]. Siendo así, aquellas determinaciones de hechos formuladas por el ente administrativo deberán sostenerse cuando estén basadas en evidencia sustancial que surja del expediente administrativo considerado en su totalidad[40]. Por otro lado, las determinaciones de derecho pueden ser revisadas en su totalidad[41]. No obstante, los tribunales deberán darles peso y deferencia a las interpretaciones que la agencia realice de aquellas leyes particulares que administra[42]. El Tribunal Supremo ha dispuesto que, la deferencia que le deben los tribunales a la interpretación que haga el ente administrativo sobre aquellas leyes y reglamentos que le corresponde poner en vigor, cede si la agencia: "(1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales fundamentales[43]. Finalmente, nuestra más Alta Curia ha expresado que, conforme lo anterior, el criterio administrativo no podrá prevalecer en aquellas instancias donde la interpretación estatutaria realizada por una agencia provoque un resultado incompatible o contrario al propósito para el cual fue aprobada la legislación y la política pública que promueve. Así, "la deferencia judicial al *expertise* administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de una injusticia"[44].

**-E-**

En nuestro ordenamiento jurídico la ley es el medio o fuente que establece los límites del poder y de las facultades de las agencias

---

[39] *Rolón Martínez v. Supte. Policía, supra*, pág. 36.
[40] *Íd.*; *Oficina de Ética Gubernamental v. Martínez Giraud, supra*; *Super Asphalt v. AFI y otros, supra*, págs. 819-820.
[41] *Rolón Martínez v. Supte. Policía, supra*, pág. 36; *Torres Rivera v. Policía de PR, supra*, pág. 627; Sec. 4.5 LPAUG, 3 LPRA sesc. 9675.
[42] *Rolón Martínez v. Supte. Policía, supra*, págs. 36-37; *Torres Rivera v. Policía de PR, supra*, pág. 627.
[43] *Íd.*, págs. 627-628; *Oficina de Ética Gubernamental v. Martínez Giraud, supra.*
[44] *Íd.*

administrativas[45]. La ley habilitadora es el mecanismo legal que le delega a la agencia los poderes necesarios para actuar de conformidad con el propósito legislativo[46]. En virtud de ello, una agencia administrativa sólo puede llevar a cabo las funciones que se le han encomendado legislativamente y aquellas que surgen de su actividad o encomienda principal[47]. No obstante, si la actuación de la agencia administrativa excede los poderes delegados por la Asamblea Legislativa, será considerada *ultra vires* y, por ende, nula.

De conformidad con lo anterior, nuestro Tribunal Supremo ha expresado que "una agencia administrativa no puede asumir jurisdicción sobre situación alguna que no esté autorizada por ley; es decir, ni la necesidad, ni la utilidad, ni la conveniencia pueden sustituir al estatuto en cuanto a fuente de poder de una agencia administrativa. *Es por ello que cualquier duda en cuanto a la existencia de dicho poder debe resolverse en contra del ejercicio del mismo*"[48].

**-F-**

El Departamento de Asuntos del Consumidor fue creado mediante la Ley Núm. 5 de 23 de abril de 1973, según enmendada[49], para vindicar e implementar los derechos del consumidor[50]. Esta ley, le impone al Secretario de DACo, "el deber ministerial de promover y velar por el cumplimiento *de todas* las leyes, las reglas, los reglamentos y las órdenes que afecten los intereses del consumidor[51].

---

[45] *Caribe Comms. v. P.R.T.Co.*, 157 DPR 203, 211 (2002).
[46] *Íd.*
[47] *Caribe Comms. v. P.R.T.Co, supra*, a la pág. 213.
[48] *Amiero González v. Pinnacle Real Estate*, 173 DPR 363 (2008); citando a *Raimundi Meléndez v. Productora de Agregados*, 162 DPR 215, 225 (2004).
[49] 3 LPRA secc. 341.
[50] Art. 3 de la Ley Núm. 5 de 23 de abril de 1973, *supra*, 3 LPRA sec. 341b; *Martínez v. DACo*, 163 DPR 594, 600 (2004); DACo *v. Fcia. San Martin*, 175 DPR 198, 204 (2009).
[51] *Íd.*, págs. 204-205. (Citas omitidas).

Conforme con esos principios, la ley *"Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces en Puerto Rico"*[52], faculta a DACo, a supervisar el negocio de Bienes Raíces[53] y entre otras, considerar y adjudicar las querellas radicadas por los consumidores al amparo de esta Ley[54].

Atinente a la controversia que nos concierne, el precitado estatuto define al *comprador* como: "cualquier persona que sea la parte adquirente en un negocio de bienes raíces de un bien inmueble localizado en o fuera del Estado Libre Asociado de Puerto Rico"[55].

Asimismo, define al *corredor de bienes raíces* como la persona natural que, poseyendo una licencia para ejercer la profesión de corredor de bienes raíces expedida por la Junta, actúe como intermediario, mediante pago o promesa de pago de cualquier compensación mutua y previamente convenida, entre las partes que acuerden llevar a cabo en el Estado Libre Asociado de Puerto Rico una transacción de compraventa, promesa de venta, opción de compra o venta, permuta, arrendamiento, subasta, administración de propiedades, o en el ofrecimiento, promoción o negociación de los términos de una venta, opción de compraventa, promesa de venta, alquiler, administración, permuta de bienes inmuebles localizados en o fuera del Estado Libre Asociado de Puerto Rico. Sin embargo, no se considerará como ejercer la profesión de corredor de bienes raíces para propósitos de este capítulo, cualquier tipo de transacción relacionada con la compra, venta, alquiler, permuta, subasta o administración de un bien inmueble en la que él sea el titular de dicho bien inmueble y actúe en beneficio propio y no como intermediario entre dos (2) clientes[56].

---

[52] 20 LPRA secc. 3025.
[53] 20 LPRA secc. 3046.
[54] *Íd.*
[55] 20 LPRA secc. 3025.
[56] *Íd.*

A esos efectos, la Ley para Reglamentar el Negocio de Bienes Raíces, *supra,* en su Artículo 31, establece aquellos actos o prácticas que están proscritas por dicha ley. En particular, en el Artículo 31, inciso 11[57], establece como una práctica proscrita el:

> (11) Retener cualquier depósito cuando no se lleve a cabo la transacción o gestión objeto de dicho depósito sin que haya mediado culpa del comprador. Se entenderá que no hay culpa del comprador cuando la institución financiera le deniegue el financiamiento al comprador por éste no haber cualificado para otorgar y perfeccionar una transacción de bienes raíces, luego de haber cumplido cabalmente con otros requisitos de ley y obligaciones propias de este tipo de negocio. No obstante, se entenderá que hay culpa del comprador cuando éste miente, intencionalmente omita o retrase la entrega de información, voluntariamente tome un préstamo o asuma una obligación durante el proceso de solicitud del financiamiento, con la intención de que se le deniegue el financiamiento. Copia del documento que señale la denegación será entregada por el comprador al corredor de bienes raíces contratado. Esta prohibición no aplicará en los casos en que una vez el financiamiento sea concedido, el comprador no culposo decida no aceptar el mismo, y esta decisión del comprador no culposo provoque que la transacción de bienes raíces se dé por concluida.

### III.

Estudiada la grabación de la vista, los escritos de las partes, el expediente administrativo, así como el derecho aplicable, procedemos atender la controversia ante nuestra consideración. Veamos.

Es menester dejar establecido que este foro intermedio reconoce la norma de deferencia a los foros administrativos. No obstante, tal deferencia cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o los reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales[58].

---

[57] 20 LPRA secc. 3034.
[58] *Torres Rivera v. Policía de PR,* 196 DPR 606, 625-626 (2016).

En su recurso de revisión, el señor Laguna Ríos arguye que el DACo erró en seis (6) instancias. En síntesis, argumenta el recurrente que: (1) el juez administrativo actuó con perjuicio y parcialidad en craso abuso de su discreción, al no permitir interrogatorio al compareciente; (2) alega que, no surge del expediente ni testimonios que el querellante Josué Laguna Ríos se comunicó directamente con Firstbank; (6) arguye que el querellante envió una carta a Firstbank contrario a lo testificado en vista. Los errores 1, 2 y 6 previamente mencionados, se ciñen a una revisión de la apreciación de la prueba que tuvo ante sí el DACo. Por otro lado, en el error (3) aduce el recurrente que, el trabajo realizado por la señora Mojica, empleada de Iconic, puede entenderse que actuó en los contornos de la definición de *corredor de bienes raíces* y fue a esta persona a quien le entregó un cheque de $1,600 dólares; y los errores (4) y (5) están relacionados al proceso de financiamiento en Money House.

Cabe destacar que la vista se celebró de forma remota, y la única prueba testifical fue el señor Laguna Ríos. Surge del testimonio del recurrente[59], que el 9 de octubre de 2022, este acudió a las oficinas de Iconic luego de tener precualificación de Money House, dado el hecho que poseía un certificado del Departamento de la Vivienda. La intención del recurrente era realizar su primera compraventa. En Iconic fue atendido por la señora Mojica. No hubo un contrato escrito entre Iconic y el recurrente. El señor Laguna Ríos, a través de la señora Mojica, selecciona una propiedad perteneciente al FirstBank. La señora Mojica fungió como intermediaria entre el recurrente y el FirstBank[60]. El 13 de octubre de 2022 la parte recurrente y FirstBank otorgaron un contrato de

---

[59] Minutos 17:45, 19:49, 19:50, 24:34, 26:02–26:04, 27:26-27:27, 31:23-32:40.
[60] Argumento esbozado por el representante legal de Iconic durante la vista administrativa.

compraventa. Durante la vista, el señor Laguna Ríos admitió que firmó el contrato de compraventa sin leerlo. El precio de la compraventa fue de $70,000.00 más $1,600.00 dólares por concepto de depósito, el cual fue entregado por el recurrente a la señora Mojica.

Durante el proceso de financiamiento entre Money House y el señor Laguna Ríos, este tuvo problemas para cualificar al préstamo, porque su crédito estaba comprometido. Ante ello, Money House le notificó que necesitaba tener un codeudor para que pudiese iniciar el proceso de financiamiento. En ese momento, la parte recurrente entendía que su hermana iba a ser la codeudora. No obstante, la hermana del señor Laguna Ríos tampoco podía ser la codeudora. Esta situación de incapacidad financiera le fue notificado a Money House y a la señora Nichole Mojica. Surge del testimonio del señor Laguna Ríos, que la señora Mojica lo instruyó sobre el tipo de carta que habría de presentar al FirstBank para cancelar el contrato de compraventa.

El 28 de noviembre de 2022, el señor Laguna Ríos envió una carta al FirstBank y expresó lo siguiente: *Por este medio yo Josué Laguna Ríos, deseo cancelar proceso de compra del hogar que fue opcionado ya que la persona la cual iba a ser Co-deudor por motivos personales no puede ser parte del proceso. La misma era importante para completar el proceso de compra. Desafortunadamente, me veo forzado a posponerlo en un futuro. Le agradezco la orientación la asistencia en el proceso. Solicito amablemente me dejen saber si hay alguna devolución referente al dinero pagado de adelanto.*

Posterior al recibo de la carta, el FirstBank le notificó que no procedía la devolución porque él canceló voluntariamente la transacción; en consecuencia y bajo las cláusulas contractuales, no procede la entrega del dinero. En síntesis, el FirstBank aplicó el

Artículo 11 (a) y razonó que el querellante nunca originó una solicitud de financiamiento[61].

Es menester destacar que, en el contrato otorgado entre la parte recurrente y el FirstBank existen dos cláusulas sobre el tema de la devolución del depósito de $1,600.00, a saber:

**Artículo Once**: El BANCO, previa notificación escrita a la parte compradora, podrá resolver este contrato por cualquiera de las siguientes causas:

a. **Cuando la PARTE COMPRADORA se negare o desistiere de otorgar la escritura de compraventa d**entro del término estipulado en el ARTÍCULO DOS de este Contrato, en cuyo caso el BANCO tendrá derecho a retener la totalidad (o el 100% del Depósito que se entrega con la firma de este Contrato según establecido en el ARTÍCULO UNO.

b. Cuando la PARTE COMPRADORA no haya pagado la totalidad del precio acordado al momento de otorgársela escritura de compraventa, en cayo caso el BANCO tendrá derecho a retener la totalidad (o el |100%) del Depósito que se entrega con la firma de este Contrato según establecido en el ARTÍCULO UNO.

c. Cuando El BANCO esté imposibilitado de cerrar la compraventa por situaciones legales que le impidan vender, en cuyo caso el BANCO devolverá a la PARTE COMPRADORA la totalidad (o el 100%) del Depósito que se entrega con la firma de ese Contrato según establecido en el ARTÍCULO UNO. De darse esta situación la PARTE COMPRADORA, renuncia expresamente a entablar cualquier tipo de reclamación al BANCO, por no haberse podido cerrar la compraventa de la propiedad.

Cuando se resuelva el contrato por las causas (a) y/o (b), enumeradas en este artículo, o por cualquier otra causa atribuible a la PARTE COMPRADORA, el BANCO retendrá el 100% de la cantidad entregada en concepto de depósito por la PARTE COMPRADORA.

**Artículo Doce**: Este Contrato no esta sujeto a la aprobación del financiamiento alguno. Por tanto, **si la PARTE COMPRADORA solicita financiamiento con cualquier Institución financiera y el mismo no le fuese aprobado dentro del término provisto en el ARTÍCULO DOS o el mismo le fuese denegado sin que medie culpa de la PARTE COMPRADORA, el BANCO tendrá derecho a rescindir este CONTRATO, quedando la transacción cancelada y el BANCO tendrá derecho a retener la mitad d (o 50%) del Depósito** que sen entrega con la firma de este Contrato según establecido en el ARTÍCULO UNO. Dicha retención en ningún momento será menor de quinientos ($500.00).

---

[61] Véase Contestación de la Demanda del FirstBank.

[...]

Conforme a lo anterior, resolvemos que la señora Mojica fungió como intermediaria en una transacción de bienes raíces entre el recurrente y FirstBank y le aplica la definición de *corredor de bienes raíces* de la Ley Núm. 10-1994.

Fíjese que al revisitar la Resolución del DACo, no surge de las determinaciones de hecho que atendiera si Iconic fungió o no como corredor de bienes raíces. Empero, en las conclusiones de derecho menciona varios artículos de la "*Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces en Puerto Rico*"[62].

Fíjese que en la *Moción en solicitud de desestimación y/o cierre*[63] y archivo presentado por Iconic ante el DACo arguye que [...] 12. *de la lectura del contrato de opción no surge que este fue firmado por Iconic Realty ni algún representante....* Más adelante, expresa que [...] *el querellante tampoco tiene contrato con Iconic Realty. No surge del expediente contrato alguno firmado por Iconic Realty para brindar servicio de corretaje para el querellante. Por este motivo Iconic Realty no fungió en ningún momento como corredora de bienes raíces del querellante y no tiene otra obligación para con el querellante*[64].

Notemos que la "*Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces en Puerto Rico*"[65], en su Artículo 2 (g)[66] define corredor de bienes raíces:

> "Corredor de Bienes Raíces" es la persona natural que, poseyendo una licencia para ejercer la profesión de Corredor de Bienes Raíces expedida por la Junta, **actúe como intermediario, mediante pago o promesa de pago de cualquier compensación mutua y previamente convenida,** entre las partes que acuerden llevar a cabo en el Estado Libre Asociado de Puerto Rico una transacción de compraventa, promesa de venta, opción de compra o venta,

---

[62] 20 LPRA secc.3025.
[63] *Alegato en Oposición*, apéndice, a las págs. 11-16.
[64] *Íd.*
[65] 20 LPRA secc. 3025.
[66] *Íd.*

permuta, arrendamiento, subasta, administración de propiedades, o en el ofrecimiento, promoción o negociación de los términos de una venta, opción de compraventa, promesa de venta, alquiler, administración, permuta de bienes inmuebles localizados en o fuera del Estado Libre Asociado de Puerto Rico. Sin embargo, no se considerará como ejercer la profesión de Corredor de Bienes Raíces para propósitos de esta Ley, cualquier tipo de transacción relacionada con la compra, venta, alquiler, permuta, subasta o administración de un bien inmueble en la que él sea el titular de dicho bien inmueble y actúe en beneficio propio y no como intermediario entre dos (2) clientes.

Apuntalamos que, en el contrato[67] firmado entre FirstBank y el señor Laguna Ríos, en su artículo veinte, dispone lo siguiente:

*Las partes contratantes reconocen y aceptan que en el trámite de mercadear la propiedad Iconic Realty Group LLC, actuó* **como Corredor de Bienes Raíces licenciado** *(en adelante el "Corredor") y la comisión del Corredor será pagada por el Banco bajo los términos y condiciones acordados entre el Banco y el Corredor en contrato separado.*

Ante esta cláusula contractual, no cabe duda de que Iconic fungió como corredor de bienes raíces, por lo cual, le aplica con rigurosidad la *Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces en Puerto Rico.* En específico, el Artículo 31, que proscriben actos o prácticas específicas[68]. En lo pertinente al caso de marras, destacamos la siguiente:

(16) Previo al otorgamiento de un contrato de corretaje o listado neto, no orientar adecuadamente al cliente sobre el alcance de la transacción y la conveniencia de utilizar los servicios de un tasador profesional.

Nuestro Tribunal Supremo en *SLG Rodríguez-Rivera v. Bahía Park*[69], dispuso referente a la Ley Núm. 10-1994 "siempre ha sido la intención legislativa que los corredores de bienes raíces les expliquen a sus clientes los términos del contrato, el alcance de la exclusividad o falta de esta y la fecha de vencimiento". Por lo cual, independientemente de cuál haya sido el tipo de contrato de corretaje en el presente caso, los requisitos del Artículo 31, inciso 9, de la Ley Núm. 10-1994, aplican al caso de marras.

---

[67] Anejo 1 de la *Solicitud de desestimación al amparo de la Regla 83 (B) (1) y (3) del Reglamento del Tribunal de Apelaciones.*
[68] 20 LPRA secc. 3054.
[69] 180 DPR 340, 366 (2010).

Cónsono con lo anterior, el Reglamento de Ética, *supra,* en su Artículo 5, Sección 4, exige a los corredores de bienes raíces que pongan por escrito los compromisos que realicen y entreguen copia de los acuerdos a ambas partes. Dicha exigencia no se refiere únicamente a los contratos que logre el corredor de bienes raíces, sino a todos los compromisos que realice.

Analizados los hechos de este caso, nos revelan como el DACo, lejos de proveerle un remedio apropiado al recurrente, optó por desatender su petitorio. Consecuentemente, a la determinación del DACo no le cobija nuestra deferencia judicial. Por tal razón, entendemos que el señor Laguna Ríos no fue debidamente orientado por Iconic, aun cuando existía un contrato de corretaje, el cual exigía dar un asesoramiento adecuado e informado bajo los parámetros de la *"Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces en Puerto Rico".* Ante este cuadro y la falta de orientación de Iconic, procede el rembolso solicitado por la parte recurrente.

**IV.**

Por los fundamentos antes expuestos, ***revocamos*** la *Resolución* emitida por el DACo y declaramos *Con Lugar* la *Querella* presentada por el recurrente. Por tanto, procede que Iconic pague al señor Laguna Ríos la cantidad de mil seiscientos dólares ($1,600.00).

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones